MAGIC MART, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6512–66. Filed February 17, 1969.

*LeRoy Katz*, for the petitioner.
*James J. Gallagher*, for the respondent.

STERRETT, *Judge:*[1] Respondent determined deficiencies in petitioner's income tax for the calendar years 1959 through 1962 in amounts, as follows:

| Year | Deficiency |
| --- | --- |
| 1959 | $4, 617. 34 |
| 1960 | 5, 029. 46 |
| 1961 | 5, 219. 49 |
| 1962 | 6, 004. 06 |

[1] This case was tried by Judge C. Rogers Arundell (recalled), and briefs were duly filed. Judge Arundell died on May 28, 1968. This case, not having been disposed of, notice of reassignment was given to the parties on June 5, 1968, suggesting that either party could file a motion for rehearing or reargument on or before July 8, 1968. On June 21, 1968, petitioner advised that no further motions would be filed. Respondent made no response. An order reassigning the case to Judge Samuel B. Sterrett for disposition thereof was entered on Oct. 22, 1968.

The only issue for decision is whether, for the taxable years in question, petitioner was availed of for the purpose of avoiding income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed, and is thus subject to the accumulated earnings tax imposed by section 531 of the 1954 Code.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner is a corporation incorporated and existing under the laws of the State of West Virginia, which was formed on January 1, 1948, as "Ammar Brothers, Incorporated of Grundy, Virginia," and which on December 20, 1966, by authority of the secretary of state of West Virginia changed its name to Magic Mart, Inc. Petitioner is authorized to do business in the Commonwealth of Virginia, and by authority of the State Corporation Commission of Virginia, petitioner's name was changed to Magic Mart, Inc. on January 25, 1967. Petitioner's principal office is now and at the time of the filing of the petition [2] was in Bluefield, W. Va. Its registered office in the Commonwealth of Virginia was and is now Grundy, Buchanan County, Va.

Petitioner timely filed its Federal corporation income tax returns for the taxable years ending December 31, 1959, 1960, 1961, and 1962 with the district director of internal revenue, Parkersburg, W. Va.

On March 15, 1966, the Internal Revenue Service mailed by certified mail to petitioner a letter pursuant to the provisions of section 534 [3] of the Internal Revenue Code of 1954, notifying petitioner that the Commissioner of Internal Revenue proposed to issue a statutory notice of deficiency for the years 1959, 1960, 1961, and 1962 setting forth an amount with respect to section 531 relating to the accumulated earnings tax.

Within 60 days after mailing of the notification by the Internal Revenue Service, the petitioner timely filed a statement intended to comply with the provisions of section 534(c) of the Code.

By order of this Court dated December 13, 1967, it was—

ORDERED that petitioner's motion that the burden of proof is upon respondent with respect to the grounds set forth in petitioner's statement submitted pursuant to Section 534(c) of the Internal Revenue Code be and is hereby denied.

During the years involved in this proceeding there was issued and outstanding 100 shares of stock in the petitioner corporation which were owned by the following persons in the amounts indicated:

[2] The petition was filed under the name of "Ammar Brothers, Incorporated of Grundy, Virginia." By order of this Court dated Jan. 11, 1968, the caption was amended to read "Magic Mart, Inc., Petitioner, v. Commissioner of Internal Revenue, Respondent, Docket no. 6512–66."

[3] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

| Stockholder | Years and number of shares | | | |
| --- | --- | --- | --- | --- |
| | 1959 | 1960 | 1961 | 1962 |
| K. A. Ammar | 32 | 32 | 28 | 3 |
| S. A. Ammar | 32 | 32 | 30 | 30 |
| N. A. Ammar | 32 | 32 | 32 | 20 |
| Lydia Ammar | 2 | 2 | 2 | 2 |
| Rasheedy Ammar | 0 | 0 | 2 | 2 |
| Salwa Ammar | 2 | 2 | 2 | 2 |
| Adele A. Cecil | 0 | 0 | 4 | 9 |
| K. A. Ammar, Jr | 0 | 0 | 0 | 5 |
| Richard F. Ammar | 0 | 0 | 0 | 5 |
| F. K. Ammar | 0 | 0 | 0 | 5 |
| Rosella A. Michael | 0 | 0 | 0 | 5 |
| N. A. Ammar, Jr | 0 | 0 | 0 | 12 |
| Total | 100 | 100 | 100 | 100 |

During all of the years in issue, 1959 through 1962, the officers were three brothers, as follows: President, K. A. Ammar; vice president, S. A. Ammar; secretary-treasurer, N. A. Ammar.

K. A. Ammar and S. A. Ammar migrated from Syria to the United States in 1911. N. A. Ammar joined his two brothers about 1920. K. A. Ammar died August 6, 1967.

A. B. Wholesale, Inc., is a corporation organized under the laws of the State of West Virginia on July 1, 1961. Its corporate charter authorized the issuance of 200 shares of stock, only 100 of which were issued and outstanding on December 31, 1961 and 1962, and which were owned by the following persons in the amounts indicated:

| | 1961 | 1962 |
| --- | --- | --- |
| K. A. Ammar | 33 | 33 |
| S. A. Ammar | 34 | 34 |
| N. A. Ammar | 33 | 33 |

Ammar Bros., a partnership, was formed in 1920. During the years involved in this proceeding, the partnership consisted of the three brothers, each owning a one-third interest therein.

Ammar Bros. Real Estate, Inc., of Bluefield, W. Va., was incorporated under the laws of the State of West Virginia on July 1, 1948, with an authorization of 750 shares of stock which were issued and outstanding and during the taxable years were owned by the following persons in the amounts indicated:

| | 1959 | 1960 | 1961 | 1962 |
| --- | --- | --- | --- | --- |
| K. A. Ammar | 250 | 109 | 109 | 109 |
| Fayaz K. Ammar | 0 | 25 | 25 | 25 |
| K. A. Ammar, Jr | 0 | 33 | 33 | 33 |
| Richard Ammar | 0 | 33 | 33 | 33 |
| Rosella A. Michael | 0 | 25 | 25 | 25 |
| Adele A. Cecil | 0 | 25 | 25 | 25 |
| S. A. Ammar | 250 | 250 | 250 | 250 |
| N. A. Ammar | 250 | 250 | 250 | 250 |
| | 750 | 750 | 750 | 750 |

The function of Ammar Bros. Real Estate, Inc., of Bluefield, W. Va., was to purchase, lease, and sell real estate.

Style Center, Inc., of Grundy, Va., is a corporation organized under the laws of the State of West Virgina, on August 10, 1961, and is authorized to do business in the State of Virginia with an authorized capital stock of 100 shares. During the years 1961 and 1962 these 100 shares were issued and outstanding and were owned by the following persons in the amounts indicated:

|  | 1961 | 1962 |
|---|---|---|
| K. A. Ammar | 29 | 29 |
| S. A. Ammar | 33 | 33 |
| N. A. Ammar | 33 | 33 |
| Adele A. Cecil | 5 | 5 |
|  | 100 | 100 |

Style Center, Inc., of Grundy, Va., operated a store in Grundy in which it sold women's clothing.

The officers of A. B. Wholesale, Inc., Ammar Bros. Real Estate, Inc., of Bluefield, W. Va., and Style Center, Inc., of Grundy, Va., during the years in issue were the same as the officers of petitioner.

The Ammar family operated 21 corporations engaging in the retail business and operating in the States of Virginia, West Virginia, and Kentucky.

A. B. Wholesale, Inc., operated a warehouse for the storage of inventory to be sold by stores owned by the Ammar family and did some of the purchasing for the same stores. The Ammar Bros. partnership purchased the bulk of the inventory used to supply the retail stores owned by the Ammar family.

Petitioner paid dividends in the following amounts for the following years:

| Year | Amount | Year | Amount |
|---|---|---|---|
| 1948 | None | 1958 | None |
| 1949 | None | 1959 | None |
| 1950 | None | 1960 | None |
| 1951 | None | 1961 | None |
| 1952 | None | 1962 | None |
| 1953 | $9,000 | 1963 | $20,000 |
| 1954 | None | 1964 | 20,000 |
| 1955 | None | 1965 | 16,500 |
| 1956 | 30,000 | 1966 | None |
| 1957 | 15,000 | | |

The dividends paid by petitioner in 1963, 1964, and 1965 were approximately equal to petitioner's net income after taxes for those years.

If all accumulated earnings of petitioner during the years in issue had been distributed to the stockholders instead of being accumulated, the stockholders would have received additional dividend income during those years in amounts as follows:

| | 1959 | 1960 | 1961 | 1962 |
|---|---|---|---|---|
| K. A. Ammar and wife | $5,708.71 | $6,218.25 | $5,693.99 | $1,091.65 |
| S. A. Ammar and wife | 5,372.90 | 5,852.46 | 6,073.59 | 6,986.54 |
| N. A. Ammar and wife | 5,708.70 | 6,218.24 | 6,453.19 | 4,803.24 |
| Subtotal | 16,790.31 | 18,288.95 | 18,220.77 | 12,881.43 |
| Other stockholders | 0 | 0 | 759.20 | 8,951.53 |
| Total | 16,790.31 | 18,288.95 | 18,979.97 | 21,832.69 |

The net increase in tax liabilities to K. A. Ammar and wife, S. A. Ammar and wife, and N. A. Ammar and wife during the 4 years would have been $28,108.81.

During the years in issue, petitioner was engaged in the operation of a retail store on Main Street in Grundy, Buchanan County, Va., in which it sold only "soft" goods. Upon the construction and opening of the new building in 1967 (as hereinafter described), "hard" goods were added.

Grundy is a small mining community or town surrounded by mountainous territory with a population of approximately 2,500. Its economy is dependent solely upon the coal industry. Petitioner's store is located on the only street in town which is appropriately named Main Street. The store's main floor faces Main Street, but a basement entrance in the rear faces River Road, which road is below the Main Street level and runs along the Levisa Fork of the Big Sandy River. This rear entrance was subject to flooding from the overflow of the Levisa Fork. The Levisa Fork is a very swift stream and, when it rises, it rises rapidly. The petitioner suffered from major floods in 1957, 1959, and 1963.

Petitioner's accumulated earnings and profits and the increase in earnings and profits over prior years during the years here in issue were as follows:

| Date | Accumulated earnings and profits | Increase over prior years |
|---|---|---|
| January 1, 1959 | $94,699.88 | |
| December 31, 1959 | 116,790.31 | $22,090.43 |
| December 31, 1960 | 135,079.26 | 18,288.95 |
| December 31, 1961 | 154,059.23 | 18,979.97 |
| December 31, 1962 | 175,885.92 | 21,826.69 |

Petitioner's annual operating costs, including its cost of goods sold and its other operating costs (excluding depreciation and Federal income taxes), for the years here involved were as follows:

| Year ended Dec. 31— | Operating costs (excluding depreciation and Federal income taxes) | Cost of goods sold | Total |
|---|---|---|---|
| 1959 | $46,672.32 | $138,821.78 | $185,494.10 |
| 1960 | 61,397.26 | 166,555.18 | 227,952.44 |
| 1961 | 57,062.89 | 157,960.55 | 215,023.44 |
| 1962 | 51,733.47 | 146,702.75 | 198,436.22 |

Petitioner's working capital [4] as of the end of the years in issue was as follows:

| | 1959 | 1960 | 1961 | 1962 |
|---|---|---|---|---|
| **Current assets** | | | | |
| Cash | $15,090.46 | $5,501.57 | $33,932.92 | $30,762.26 |
| Prepaid insurance | 28.89 | 635.90 | 297.21 | 267.21 |
| Inventory | 55,497.89 | 75,368.52 | 51,725.51 | 54,018.71 |
| Prepayment for merchandise: | | | | |
| A. B. Wholesale, Inc.[1] | 44,914.13 | 42,479.31 | 19,732.37 | 18,521.22 |
| Ammar Bros. (partnership) | | | 6,116.77 | 22,888.32 |
| Ammar Bros. Real Estate, Inc.[5] | 20,000.00 | 20,000.00 | 20,000.00 | 31,100.00 |
| Style Center, Inc.[5] | 0 | 0 | 41,678.35 | 41,678.35 |
| Total current assets | 135,531.37 | 143,985.30 | 173,483.13 | 199,236.07 |
| **Current liabilities** | | | | |
| Accounts payable | 200.00 | | 1,634.84 | 1,634.84 |
| Accrued taxes and expenses | 545.46 | 836.80 | 820.04 | 1,082.65 |
| Accrued income taxes | 14,292.09 | 9,756.99 | 10,104.05 | 13,016.53 |
| Total current liabilities | 15,037.55 | 10,593.79 | 12,558.93 | 15,734.02 |
| Working capital [6] | 120,493.82 | 133,391.51 | 160,924.20 | 183,502.05 |

[1] Prior to incorporation in 1961 it was Ammar Bros. Warehouse, a partnership.

Petitioner's ratio of current assets to current liabilities, if the said notes in footnote 5 are included in current assets, during the years in issue would be as follows:

| Year | Current ratio |
|---|---|
| 1959 | 9 to 1 |
| 1960 | 13.6 to 1 |
| 1961 | 13.8 to 1 |
| 1962 | 12.7 to 1 |

On February 24, 1956, petitioner lent $20,000 to Ammar Bros. Real Estate, Inc., of Bluefield, W. Va., to enable the latter to build a warehouse. The cost of the warehouse, together with the cost of the land on which the warehouse was built, was approximately $35,000. The real estate company leased the warehouse to A. B. Wholesale, Inc., for use of storing inventories of goods purchased by A. B. Wholesale, Inc.,

[4] The term "working capital" is synonymous with such terms as "net quick assets" and "net liquid assets" found in the decided cases.

[5] Petitioner contends that the notes given to it by Ammar Bros. Real Estate, Inc., of Bluefield, W. Va., and Style Center, Inc., of Grundy, Va., as more fully described later herein, should not be included as a part of petitioner's current assets, whereas the respondent contends they should be included. We need not resolve this issue between the parties for the reason that it will make no difference in the final result of this case whether they are or are not included. However, for present purposes we have included them.

[6] Current assets less current liabilities.

to be resold to petitioner and the other Ammar family-operated stores. The ratio that petitioner's advance of $20,000 for the construction of the warehouse bears to the cost of the warehouse ($35,000) was approximately the same as the utilization of the warehouse by petitioner bore to the total utilization of the warehouse. The warehouse benefited petitioner more than it benefited any of the other Ammar family stores because petitioner was the highest volume store and also the one with the most limited amount of storage space. Petitioner received more merchandise from the warehouse than did any of the other stores. During the taxable years in question petitioner purchased from A. B. Warehouse, Inc., and its predecessor, the Ammar Bros. Warehouse, merchandise in the total amount of $218,524.39.

In 1962 the warehouse was doubled in size and on April 5, 1962, petitioner lent the real estate company an additional $10,000. Demand notes, with interest at 4 percent per annum, were given to petitioner for both loans. Accrued interest on these notes on December 31, 1962, amounted to $1,100. No payment of principal or interest on these notes was made during the years in question.

In 1958 petitioner, as further stated below under the heading of "Expansion," contacted Amy Lee Powers with the possibility in mind of leasing and eventually buying the building on Main Street, five stores west of petitioner's store, in which her shop the Style Center was located. Early in 1960 petitioner purchased from Amy Lee Powers for $17,000 her stock of goods and fixtures and obtained a lease on the building in which the Style Center business was located at a rental of $200 per month. Petitioner continued its negotiations with Amy Lee Powers to purchase the building. Finally, in 1961, Amy Lee Powers gave petitioner a price for the building of $225,000. Petitioner thought this price was too high and did not buy.

Style Center, Inc., of Grundy, Va., was organized in 1961 by the officers of petitioner to take over the inventory and business petitioner had acquired from Amy Lee Powers. On June 30, 1961, petitioner lent Style Center, Inc., of Grundy, Va., $41,678.35 with which to purchase the inventory and business from petitioner. A demand note with interest at 4 percent per annum was given to petitioner for this loan. No payment of principal or interest on this note was made during the years in question.

A comparison of the working capital with petitioner's balance sheets for the years in question is as follows:

| | 1959 | 1960 | 1961 | 1962 |
|---|---|---|---|---|
| Total current assets | $135,531.37 | $143,985.30 | $173,483.13 | $199,236.07 |
| Total other assets [1] | 6,296.49 | 11,687.75 | 2,734.92 | 1,183.53 |
| Total assets | 141,827.86 | 155,673.05 | 176,218.05 | 200,419.60 |
| Total current liabilities | 15,037.55 | 10,593.79 | 12,558.93 | 15,734.02 |
| Total other liabilities | None | None | None | None |
| Total liabilities | 15,037.55 | 10,593.79 | 12,558.93 | 15,734.02 |
| Capital stock | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 |
| Surplus | 116,790.31 | 135,079.26 | [2] 153,659.12 | [2] 174,685.58 |
| Total liabilities and capital | 141,827.86 | 155,673.05 | 176,218.05 | 200,419.60 |
| Total capital | 126,790.31 | 145,079.26 | 163,659.12 | 184,685.58 |
| Less working capital | 120,493.82 | 133,391.51 | 160,924.20 | 183,502.05 |
| Difference is total other assets | 6,296.49 | 11,687.75 | 2,734.92 | 1,183.53 |

[1] Total other assets are buildings and other fixed depreciable assets.
[2] These figures were taken from the balance sheets (Schedule L) contained in petitioner's returns for 1961 and 1962 and do not reflect the effect of two small items of unreported accrued interest less the additional tax thereon determined by respondent for those years in the net amounts of $400 and $1,200.34, respectively.

*Working Capital Needs.*—Petitioner required working capital as of the end of the years involved in an amount at least sufficient to cover its reasonably anticipated cost of operating for a single operating cycle. An operating cycle for petitioner consisted of the period of time required to convert cash into inventory, inventory into sales and accounts receivable (if any), and then converting sales and accounts receivable into cash by collection thereof. However, petitioner made all of its sales on a cash basis, and therefore, it had no trade-accounts receivables to collect.

Petitioner's average inventory and its peak inventory for each of the taxable years were as follows:

| Year | Average inventory | Peak inventory | |
|---|---|---|---|
| 1959 | $56,106.39 | Nov | $70,666.05 |
| 1960 | 65,433.20 | Nov | 91,359.60 |
| 1961 | 63,547.01 | Apr | 95,901.57 |
| 1962 | 52,872.11 | Sept | 70,077.07 |

The average period of time required for petitioner to turn over its inventory (computed by dividing the annual cost of goods sold by the peak inventory), and the operating cycle in days (computed by dividing 365 by the number of times the inventory turned over), reduced to a decimal part of a year, were as follows:

| Year | Number of times the inventory turned over | Operating cycle in days | Reduced to a decimal part of a year |
|------|------|------|------|
| 1959 | 1.96 | 186 | 0.5096 |
| 1960 | 1.82 | 201 | .5507 |
| 1961 | 1.65 | 221 | .6055 |
| 1962 | 2.09 | 175 | .4795 |

The amounts of working capital reasonably anticipated by petitioner as being necessary to finance its cost of operations (computed by multiplying the above total operating costs by the above decimal part of a year) were as follows:

| Year | Working capital needs per operating cycle |
|------|------|
| 1959 | $94,527.79 |
| 1960 | 125,533.41 |
| 1961 | 130,196.70 |
| 1962 | 95,150.17 |

*Self-Insurer for Flood Losses.*—Petitioner's Main Street store contained 5,440 square feet of usable space, of which 2,640 square feet were on the first floor. The basement area contained 1,120 square feet devoted to selling areas, and 1,680 square feet used as a stockroom. The basement entrance of petitioner's store fronted on River Road and was subject to the overflowing of the Levisa Fork of the Big Sandy River. When the river rose, all of petitioner's basement would be flooded. Due to the rapidity of the rise, petitioner would not always have time to clear merchandise out of the basement. Floods occurred every year but the major ones were in 1957, 1959, and 1963. The water from the 1957 flood rose to the ceiling of the basement of petitioner's store.

Approximately 37 to 39 percent of petitioner's store inventory, or an inventory of about $20,000, was carried in the basement. Using the gross profits method, petitioner calculated its loss due to floods as $16,596 in 1957 and $6,966 in 1963. The gross profits method is the actual loss based on the cost of goods sold, plus failure to make anticipated profits. Petitioner had an average gross markup on sales of between 29 and 35 percent of the selling price.

Insurance against floods was not available to petitioner except at prohibitive premiums. Petitioner had to act as its own insurer. It was

reasonable for petitioner to retain sufficient earnings and profits to permit it to be a self-insurer against floods for each of the years here involved to the extent of $11,000.

*Expansion.*—During the years in issue and continuing through 1966, petitioner was engaged in negotiations and in the preparation of plans for the enlargement and expansion of its facilities, either by acquiring an additional building or by constructing an entirely new building or complex of buildings, as more fully set forth below.

In the late spring of 1957 petitioner decided to start looking for a new location for its Grundy store, for two reasons: One was to eliminate the possibility of future flood damage and the other was to expand its lines of merchandise so as to increase its volume.

There is no real estate agency in Grundy through which locations for businesses can be secured. It is necessary for a prospective buyer or lessee to make personal contact with one of the three or four persons who own all the downtown real estate.

Going west from petitioner's store on Main Street are the following pieces of real estate in the following order: (1) Petitioner's store, a drugstore, and a food store (all owned by three Morgan brothers, referred to as the Morgan heirs); (2) a jewelry store, a men's store, a ladies' store (Style Center), and a restaurant (all owned by Amy Lee Powers); and (3) the old Morgan residence, owned by the Morgan heirs.

Following the spring of 1957, and during the balance of that year and the following year 1958, petitioner, through its two vice presidents, E. M. Cecil (son-in-law of K. A. Ammar, Sr.), and K. A. Ammar, Jr., contacted the Morgan heirs from whom it was leasing its Grundy store and attempted unsuccessfully to acquire from them the location then occupied by a drugstore and a supermarket with about 60 feet of frontage in buildings owned by them on Main Street. The vice presidents discussed with the members of the Morgan family the possibility of moving petitioner's store from its then-existing location into the adjoining drugstore and supermarket locations. If petitioner had secured the drugstore and supermarket locations, it would not have utilized the basement area of the new locations which were also subject to flooding.

As previously stated herein, petitioner, in 1958 contacted Amy Lee Powers with the possibility in mind of leasing and eventually buying the building in which Style Center was located. In 1960 petitioner was successful in purchasing from Amy Lee Powers her stock of goods for $17,000, and obtained a lease on the building. In 1961 Amy Lee

Powers finally gave petitioner a price for the building of $225,000. Petitioner thought this price was too high and did not buy.

Following negotiations with Amy Lee Powers, petitioner, in 1958 and 1959 again started negotiations with the Morgan heirs, this time with the view of leasing the building to be built on the land where the Morgan family residence once stood. This proposed building was to contain approximately 9,000 square feet, which was considerably more than the 2,640 square feet on petitioner's first floor of its store. The Morgans were slow in building the building. They did not finish it until 1964. While it was under construction (1960–64), petitioner, through its officers, made several contacts with the Morgans and was assured that if they leased the building petitioner would have first option on it. On April 7, 1964, Norman E. Morgan, one of the Morgan heirs, wrote K. A. Ammar, Sr., a letter, stating:

This is to advise you that E. M. Cecil, your manager at Grundy, Virginia has been contacting me in connection with the leasing of the building that we are in the course of erecting over a period of the last several months and have been in the process of negotiating a lease with him.

We have assured Mr. Cecil that we would give full consideration to Ammar Brothers Department Stores when it is ready for occupance but we have not pushed the construction thereof as rapidly as it should have been and when it is completed we will give you full consideration before considering another lessee.

After the building was completed in 1964, the Morgans decided to use it for their own purposes and established a business in the building in competition with petitioner.

On November 1, 1962, petitioner had a special meeting of its board of directors. The minutes of this meeting stated, in part:

A Special meeting of the Board of Directors of Ammar Brothers Incorporated of Grundy, Virginia, was held in Bluefield, West Virginia, on the 1st day of November, 1962 * * *

The meeting was called to order by S. A. Ammar, Chairman of the Board of Directors.

The minutes of the previous meeting were read by the Secretary and approved as read.

S. A. Ammar, Chairman, informed the Board the purpose of the meeting was to discuss the matter of the need of more space and larger quarters for this store. It was pointed out that this matter had been discussed before, and efforts had been made to acquire larger quarters. It was further pointed out that our landlord several months ago had a tenant move out of one of his store rooms, which adjoined his drug store, which, in turn, joins our present storeroom. We approached him with the idea of his moving this drug store to the vacant room, letting us have the space wherein the drug store presently was. We were told the idea would be considered, but nothing ever developed from this. Now further, our landlord is in the process of building a large, new building about one block West of our present quarters, and we have requested that we be considered as a

lessee for the new building when it is completed. Our landlord will not make any promises.

After further discussion of the matter at hand, it was agreed that we wait until the new building is completed and see if the landlord will lease same to us. If not, in view of the urgent need of larger quarters, we must obtain same either by purchase of land and build, or purchase of present building someplace near our present quarters and remodel to suit our needs. It was agreed that this matter was of top priority and that all efforts possible be made toward this goal.

On November 6, 1963, petitioner held a special meeting of its board of directors. The minutes of this meeting, stated, in part:

S. A. Ammar, chairman of the Board of Directors, called for a discussion on the matter of larger storeroom for said Corporation. It was noted that efforts were being continued and redoubled to find a larger location, either by obtaining the new building being built by the Morgans, present landlord, or by purchasing some available land on which to construct new premises. It was brought to the attention of the Board of Directors that the Morgans promised to let the Corporation know by January, 1965, if the new building would be made available to said Corporation.

After lengthy discussions on the matter at hand, it was resolved that efforst [sic] continue along the same lines as outlined in previous special meetings and this meeting, and it was resolved that a second choice of location be looked for in the event the Morgan property could not be available. It was further resolved that the accrued earnings now shown on the Corporation's books be held for the purpose of expansion, and any dividends declared to be paid, be paid from current earnings.

In 1963 petitioner, through its officers, contacted the Breeding heirs and Quellia R. Belcher.

The Breeding heirs owned some property 2 miles west of downtown Grundy. This was a tract of land approximately 150 by 100 feet. Petitioner contacted the owner with the idea of leasing the land and constructing a building thereon. Croye & Bailey, a firm of contractors and builders, estimated the cost of the building at $58,000. However, the Breeding heirs wanted too much rent and wanted to dictate the type of building to be erected on the property, which was unsatisfactory to petitioner.

Petitioner then contacted Quellia R. Belcher. She owned a tract of land located 3 miles east of downtown Grundy. This tract had a frontage of 210 feet and a depth of about 225 feet. The first negotiations were with Gordon Belcher, the son of Quellia R. Belcher, who was in California at the time. The son thought petitioner could purchase the land for $100,000, which was acceptable to petitioner. When the mother returned from California, she started making reservations, which were not acceptable to petitioner and the deal temporarily was delayed.

Petitioner continued its efforts to secure another building. Through its officers, it contacted Edward Taylor in 1964 and 1965. Taylor had some property located about 2½ miles from downtown Grundy that had a frontage of 200 feet and a depth of about 300 feet. A 7-page option to build and a 20-year lease agreement was entered into on April 8, 1966, between Taylor and his wife, as first parties, and K. A. Ammar, Jr., as second party, who was acting for petitioner. Petitioner again called upon Croye & Bailey who, on May 2, 1966, estimated the cost of a building on the Taylor property at $235,000. Due to certain reservations made by Taylor, the option was allowed to expire.

While the Tayor option was in effect, petitioner continued its negotiation with Quellia R. Belcher, petitioner purchased the Belcher property on August 1, 1966, for $100,000, of which $30,000 was paid in cash and $70,000 was secured by a deed of trust.

In 1967 petitioner constructed a new retail store building on the Belcher property, which was completed on July 27, 1967, at a cost of $162,063.81.

The total cost of the land, building, and fixtures for the new store was $303,099.07 (consisting of $100,000 for the land, $162,063.81 for the building, and $41,035.26 for the fixtures), of which a total of $240,000 was borrowed ($170,000 from the bank and $70,000 on a deed of trust).

Of the total cost of land, building, and fixtures of $303,099.07, petitioner paid cash of $233,099.07, the source of which was as follows:

| | |
|---|---|
| (1) Borrowed from bank | $170,000.00 |
| (2) Payment of notes in full from Ammar Bros. Real Estate, Inc., of Bluefield, W. Va. | 33,745.92 |
| (3) Part payment of note from Style Center, Inc., of Grundy, Va. | 12,000.00 |
| (4) From petitioner's current cash account | 17,353.15 |
| Total cash paid | 233,099.07 |

Petitioner now operates both the old store on Main Street and the new store 3 miles east, which is called Magic Mart and has a total area of 15,960 square feet, consisting of 13,320 square feet of selling area and 2,640 square feet of stockroom area.

The new store is a one-floor building and is not subject to flooding.

It was reasonable for petitioner to retain sufficient earnings and profits to permit it to expand its business for each of the years here involved to the extent of at least $200,000. It actually took over $300,000.

*Summary of Salient Facts.*—Petitioner's accumulated earnings and profits for the years here involved and a summary of some of the information set out above are reflected in the following table:

| Year ended Dec. 31— | (1) Accumulated earnings and profits | (2) Increase in earnings and profits over prior years | (3) Net liquid assets available to meet anticipated business needs | (4) Ordinary operating expenses for one business cycle |
|---|---|---|---|---|
| 1958 | $94,699.88 | | | |
| 1959 | 116,790.31 | $22,090.43 | $120,493.82 | $94,527.79 |
| 1960 | 135,079.26 | 18,288.95 | 133,391.51 | 125,533.41 |
| 1961 | 154,059.23 | 18,979.97 | 160,924.20 | 130,196.70 |
| 1962 | 175,885.92 | 21,826.69 | 183,502.05 | 95,150.17 |

| Year ended Dec. 31— | (5) Anticipated extraordinary expenses | (6) Total needs of business for liquid assets (col. 4 plus col. 5) | (7) Excess (or shortage) of working capital (col. 6 minus col. 3) | (8) Amount accumulated beyond reasonable needs of business |
|---|---|---|---|---|
| 1958 | | | | |
| 1959 | ¹$211,000.00 | $305,527.79 | ($185,033.97) | 0 |
| 1960 | 211,000.00 | 336,533.41 | (203,141.90) | 0 |
| 1961 | 211,000.00 | 341,196.70 | (180,272.50) | 0 |
| 1962 | 211,000.00 | 306,150.17 | (122,648.12) | 0 |

¹ Flood losses $11,000 plus expansion program $200,000.

## ULTIMATE FINDINGS

During the calendar years 1959 through 1962 petitioner did not permit its earnings and profits to accumulate beyond the reasonable needs, including reasonably anticipated needs, of its business. Petitioner's undistributed earnings and profits, after taxes, for each of those years were retained for the reasonable needs of its business.

Under section 535(c)(1) petitioner was entitled to an accumulated-earnings credit for each of the years 1959 through 1962 equal to its undistributed taxable income for each of those years, so accumulated-earnings tax imposed by section 531 is not applicable.

## OPINION

The only issue is whether during the years 1959 through 1962 petitioner was availed of for the purpose of avoiding income tax on its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed, thus rendering it liable for the accumulated-earnings tax imposed by section 531. See sections 531 through 537 of the 1954 Code, as amended, the material provisions of which are in the margin.[7] Briefly, section 531 imposes the accumulated-earn-

[7] SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX.

In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every

ings tax; section 532 provides that every corporation formed or availed of for "the purpose" of avoiding the income tax of its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed shall be subject to the tax; section 533 provides that the fact that earnings and profits are permitted to accumulate "beyond the reasonable needs of the business" shall be determinative of "the purpose" unless the corporation by the preponderance of the

---

corporation described in section 532, an accumulated earnings tax equal to the sum of—

(1) 27½ percent of the accumulated taxable income not in excess of $100,000, plus

(2) 38½ percent of the accumulated taxable income in excess of $100,000.

SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX.

(a) GENERAL RULE.—The accumulated earnings tax imposed by section 531 shall apply to every corporation * * * formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX.

(a) UNREASONABLE ACCUMULATION DETERMINATIVE OF PURPOSE.—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

SEC. 534. BURDEN OF PROOF.

(a) GENERAL RULE.—In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall—

(1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or

(2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection.

(b) NOTIFICATION BY SECRETARY.—Before mailing the notice of deficiency referred to in subsection (a) the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. * * *

(c) STATEMENT BY TAXPAYER.—Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.

SEC. 535. ACCUMULATED TAXABLE INCOME.

(a) DEFINITION.—For purposes of this subtitle, the term "accumulated taxable income" means the taxable income, adjusted in the manner provided in subsection (b), minus * * * the accumulated earnings credit (as defined in subsection (c)).

(b) ADJUSTMENTS TO TAXABLE INCOME.—For purposes of subsection (a), taxable income shall be adjusted as follows:

(1) TAXES.—There shall be allowed as a deduction Federal income and excess profits taxes * * * accrued during the taxable year, * * *

\*     \*     \*     \*     \*     \*     \*

(c) ACCUMULATED EARNINGS CREDIT.—

(1) GENERAL RULE.—For purposes of subsection (a), in the case of a corporation * * * the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business * * *

(2) MINIMUM CREDIT.—The credit allowable under paragraph (1) shall in no case be less than the amount by which $100,000 exceeds the accumulated earnings and profits of the corporation at the close of the preceding taxable year.

SEC. 537. REASONABLE NEEDS OF THE BUSINESS.

For purposes of this part, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business.

evidence shall prove to the contrary; section 534 deals with the burden of proof; section 535 defines "accumulated taxable income" upon which the tax under section 531 is based; section 536 is not here material; and section 537 provides that "For the purposes of this part [part I of subchapter G of the Code which embraces sections 531 through 537], the term 'reasonable needs of the business' includes the reasonably anticipated needs of the business."

At the outset it should be noted that at the beginning of the taxable period here involved (1959–62) petitioner had not yet accumulated the minimum credit allowable under section 535(c)(2). Respondent recognized that fact in computing the deficiency for 1959.[8] Thus, petitioner contends that its retained earnings and profits in excess of the $100,000 minimum accumulated earnings credit (namely, $16,790.31 in 1959, $18,288.95 in 1960, $18,979.97 in 1961, and $21,832.96 in 1962) were held for the reasonable needs of its business, including the reasonably anticipated needs allowed by section 537, and that, therefore, under section 535 (a) and (c)(1), petitioner had no "accumulated taxable income" upon which to base an accumulated-earnings tax.

It is true that petitioner paid no dividends during the taxable years in question but permitted all of its earnings and profits (after taxes) to accumulate. However, under the applicable statute, the central issue is "the reasonable needs of the business." *Faber Cement Block Co.*, 50 T.C. 317 (1968), acq. I.R.B. 1969–2, 6. If these earnings and profits were required for the reasonable needs of the business, including the reasonably anticipated needs, it follows, as petitioner contends, that it is not subject to the accumulated-earnings tax. Whether these earnings and profits were so required involves essentially a factual determination. *Faber Cement Block Co.*, *supra*, and cases therein

---

[8] In a statement attached to the deficiency notice, the respondent computed the deficiency for 1959 as follows:

| | | |
|---|---:|---:|
| Taxable income as disclosed by return | | $34,563.39 |
| Less: Deduction for Federal income taxes accrued during the taxable year | $12,472.96 | |
| Minimum credit [$100,000 less $94,699.88] | 5,300.12 | 17,773.08 |
| Accumulated taxable income | | 16,790.31 |
| Total accumulated earnings tax: | | |
| 27½% of $16,790.31 | | 4,617.34 |
| Add: Income tax disclosed by return | | 12,472.96 |
| Income tax liability | | 17,090.30 |
| Income tax liability disclosed by return | | 12,472.96 |
| Deficiency of income tax | | 4,617.34 |

cited. In our findings we have set forth, in tabular form, a summary of the salient facts to be considered.[9]

Except for columns (1) and (2) of our table, the parties are far apart as to what these salient factors are. There is no dispute as to columns (1) and (2) which set forth the accumulated earnings and profits and the increase therein over prior years.

Column (3) involves working capital, the difference between current assets and current liabilities, or what we referred to in *Faber Cement Block Co.*, *supra*, as "petitioner's liquid position for the purpose of determining availabilities for meeting business needs." The principal difference between the parties as to the facts in column (3) is that respondent contends that the notes given to petitioner by Ammar Bros. Real Estate, Inc., of Bluefield, W. Va., and Style Center, Inc., of Grundy, Va., outstanding on December 31, 1959, 1960, 1961, and 1962, should be included as a part of petitioner's current assets, whereas petitioner contends they should not be included. As stated in footnote 5, we have, for the purposes of this case, included the notes in current assets.

*Working Capital Needs.*—In column (4) of our table we have found petitioner's operating expenses "for one business cycle" for each of the years in question. Here, the parties are far apart. In its brief petitioner contends that this Court has consistently held that the accumulation of funds to meet operating expenses "for at least one year is reasonable," citing, among other cases, *J. L. Goodman Furniture Co.*, 11 T.C. 530, 535; *F. E. Watkins Motor Co.*, 31 T.C. 288, 299 fn. 7; and *James M. Pierce Corporation*, 38 T.C. 643, 653. The parties agree, and we have found, that petitioner's annual operating costs (excluding depreciation and Federal income taxes but including the cost of goods sold) amounted to a total of $185,494.10 for 1959, $227,952.44 for 1960, $215,023.44 for 1961, and $198,436.22 for 1962. It is apparent that each of these amounts is in excess of the availabilities, namely, the working capital for each of the years set out in column (3) of our table. However, the rule stated in *Goodman*, *Watkins*, and *Pierce* does not stand for the proposition that all corporations are automatically entitled to 1 year's operating expenses as working capital. Some corporations may be so entitled; others may not. Thus, in *Smoot Sand & Gravel Corp.* v. *Commissioner*, 274 F. 2d 495, 499 (C.A. 4, 1960), affirming a Memorandum Opinion of this Court, certiorari denied 362 U.S. 976, rehearing denied 363 U.S. 832, it was found "that the nature

---

[9] Cf. *Apollo Industries, Inc.* v. *Commissioner*, 358 F. 2d 867, 871–872, (C.A. 1, 1966), remanding 44 T.C. 1 (1965), but approving the approach used by this Court in *Bardahl Manufacturing Corp.*, T.C. Memo. 1965–200; and *Faber Cement Block Co.*, 50 T.C. 317, 330–331.

of the operations was such as to require a working capital reserve 'for very much less than a full year.' "

The rule in these cases has been said to be a "rule of thumb" and one which does not necessarily control with respect to the needs of a particular business. See *Dixie, Inc.* v. *Commissioner*, 277 F. 2d 526 (C.A. 2, 1960), affirming 31 T.C. 415, certiorari denied 364 U.S. 827; *Barrow Manufacturing Co.* v. *Commissioner*, 294 F. 2d 79, 81 (C.A. 5, 1961), affirming a Memorandum Opinion of this Court, certiorari denied 369 U.S. 817 (1962); *Sterling Distributors, Inc.* v. *United States*, 313 F. 2d 803, 808 (C.A. 5, 1963) ; and *Bremerton Sun Publishing Co.*, 44 T.C. 566, 586–587. In *Dixie, Inc.* v. *Commissioner, supra* at 528, the Second Circuit Court of Appeals phrased it as follows:

The rule of thumb so stated may be one for administrative convenience but should rise to no higher level. The search must always be concerned with the needs of the particular business as they existed during the particular year. KOMA, Inc. v. Commissioner, 10 Cir., 180 F. 2d 390; World Pub. Co. v. United States, 10 Cir., 169 F. 2d 186; Hemphill Schools, Inc. v. Commissioner, 9 Cir., 137 F. 2d 961; Pelton Steel Casting Co. v. Commissioner, 7 Cir., 251 F. 2d 278.

We think the needs of petitioner's business as they existed during the taxable years do not entitle petitioner to accumulate funds to meet operating expenses for a full year. Petitioner never sold on credit and it prepaid its merchandise purchases. Also, petitioner's ratio of current assets to current liabilities for the taxable years ran from 9 to 1 in 1959 to 13.8 to 1 in 1961. Cf. *John P. Scripps Newspapers*, 44 T.C. 453, 471; *Bremerton Sun Publishing Co., supra* at 579, 586.

However, we must keep the whole forest in mind, not merely individual trees. As the Fourth Circuit Court of Appeals said in *Smoot Sand & Gravel Corp.* v. *Commissioner*, 241 F. 2d 197, 207 (C.A. 4, 1957) :

Working capital needs of businesses vary, being dependent upon the nature of the business, its credit policies, the amounts of inventories and rate of turnover, the amount of accounts receivable and the collection rate thereof, the availability of credit to the business, and similar relevant factors.

We followed these general guidelines in *Faber Cement Block Co.*, and *Bardahl* referred to in footnote 9, *supra.* See also *Apollo Industries, Inc.* v. *Commissioner*, 358 F. 2d 867, 871, wherein the court said:

Our analysis is similar to that followed in Bardahl Mfg. Corp. v. Commissioner of Internal Revenue, T.C. Memo. 1965–200, CCH Tax Ct. Mem., Dec. 27, 494 (M), at 1033. In that case the court determined petitioner's need for working capital by computing the amount of cash reasonably expected to be sufficient to cover its operating costs for a single operating cycle.

Under the circumstances, we have found that an accumulation of funds to meet operating expenses for a single operating cycle, as con-

tended for by respondent, rather than a full year, as contended for by petitioner, is the proper analysis to be applied in this case.

We do not, however, agree with the respondent concerning three steps taken by him in computing the ordinary operating expenses for one business cycle which he determined to be $56,240 for 1959, $65,208 for 1960, $63,651 for 1961, and $53,064 for 1962. Our determinations are the amounts set out in column (4) of our table.

The first step with which we disagree concerns the inventory turnover. The respondent computed the number of times the inventory turned over by dividing the cost of goods sold for each year by the "average" inventory for each year, thus arriving at the number of times the inventory turned over, as follows:

| Year | Average inventory | Cost of goods sold | Number of times inventory turned over |
|---|---|---|---|
| 1959 | $56,106.39 | $138,821.78 | 2.47 |
| 1960 | 65,433.20 | 166,555.18 | 2.55 |
| 1961 | 63,547.01 | 157,960.55 | 2.49 |
| 1962 | 52,872.11 | 146,702.75 | 2.77 |

We think that in determining the number of times the inventory turned over, the "peak" inventory during the year should be used rather than the "average" inventory. We, therefore, find the number of times the inventory turned over to be as follows:

| Year | Peak inventory | Cost of goods sold | Number of times inventory turned over |
|---|---|---|---|
| 1959 | $70,666.05 | $138,821.78 | 1.96 |
| 1960 | 91,359.60 | 166,555.18 | 1.82 |
| 1961 | 95,901.57 | 157,960.55 | 1.65 |
| 1962 | 70,077.07 | 146,702.75 | 2.09 |

The second step with which we disagree is merely an automatic adjustment. The respondent found the operating cycle in days (reduced to a decimal part of a year) by dividing 365 by the number of times the inventory turned over, with this result:

| Year | Operating cycle in days | Reduced to a decimal part of a year |
|---|---|---|
| 1959 | 148 | 0.4055 |
| 1960 | 143 | .3918 |
| 1961 | 147 | .4027 |
| 1962 | 132 | .3616 |

By dividing 365 by the *correct* number of times the inventory turned over, the result is, as we have found in our findings, as follows:

| Year | Operating cycle in days | Reduced to a decimal part of a year |
|---|---|---|
| 1959 | 186 | 0.5096 |
| 1960 | 201 | .5507 |
| 1961 | 221 | .6055 |
| 1962 | 175 | .4795 |

The third step with which we disagree can be simply stated. In arriving at the above-stated ordinary operating expenses for one business cycle determined by the respondent,[10] the respondent merely multiplied the cost of goods sold for each year by the first set of the above-stated decimal part of a year for each year.[11] By so doing, he committed two errors. First, the multiplicand, instead of just the cost of goods sold, should have been the cost of goods sold for each year, *plus* the operating costs (excluding depreciation and Federal income taxes) for each year, or a total multiplicand of $185,494.10 for 1959, $227,952.44 for 1960, $215,023.44 for 1961, and $198,436.22 for 1962. Second, this total multiplicand for each year should then be multiplied by the *second* and correct set (based upon peak inventory) of the above-stated decimal part of a year for each year. When this is done, the result is that stated in column (4) of our table.

*Self-Insurer for Flood Losses and Expansion.*—This concerns column (5) of our table and section 537. Section 537 was new in the 1954 Code and had no counterpart in the 1939 Code.[12] It was liberalizing in effect and was intended to counter the so-called court-made "immediacy doctrine" that grew up under section 102 of the 1939 Code. See *Estate of Goodall* v. *Commissioner*, 391 F. 2d 775 (C.A. 8, 1968), affirming on this point a Memorandum Opinion of this Court involving the fiscal years ended May 31, 1950, through May 31, 1954, of the Goodall Electric Mfg. Co. In the course of its opinion, the Court of Appeals for the Eight Circuit said:

> Section 537 of the 1954 Code defines the term "reasonable needs of the business" to include "the reasonably anticipated needs of the business". This had no counterpart in the 1939 Code. Accordingly, where, as here, we are concerned with tax years governed by the 1939 Code, the factfinder was not particularly obliged to consider anticipated needs in its determination of reasonable needs. This court, in Kerr-Cochran, Inc. v. Commissioner, supra, pp. 123–24 of 253 F. 2d, noted this distinction between the two Codes and participated in the so-called "immediacy doctrine". 7 Mertens, Law of Federal Income Taxation, sec. 39.50 (1967). In considering the 1939 Code, we, through Judge Johnsen, spoke of "a practical and objective basis" and "immediacy of need" which "does not go farther than direct and present apparency", and which does not "reach to visionary hopes or ambitions, nor does it compel blind acceptance of marked sweeps from previous rudder course".

---

[10] $56,240 for 1959, $65,208 for 1960, $63,651 for 1961, and $53,064 for 1962.

[11] Actually, the respondent did not reduce the operating cycle in days to a decimal part of a year. He divided the cost of goods sold by 365 and multiplied the result by the number of days in the operating cycle. The result by either method is the same.

[12] See H. Rept. No. 1337, 83d Cong., 2d Sess., p. 53, and sec. 533, pp. A172–A173; and S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 69–70, 317, 318. Page 70 of the Senate report states in part:

Your committee has revised the draft of the House provision to indicate in section 537 that the reasonable needs of the business include the reasonably anticipated needs of the business instead of stating this in a parenthetical phrase in section 533. *This is necessary to make it clear that the reasonable needs of the business, wherever it appears in connection with this tax, includes reasonably anticipated needs.* [Emphasis supplied.]

Petitioner contends it was necessary for it to retain sufficient earnings and profits to permit it to be a self-insurer against future floods. Petitioner's store was in a very precarious location and was subject to the overflowing of the Levisa Fork of the Big Sandy River in the spring of every year. Major floods occurred in 1957, 1959, and 1963. Using the gross-profits method, petitioner estimated its loss due to floods to be $16,596 in 1957 and $6,966 in 1963 and contends that it would be reasonable to retain around $16,596 each year to insure itself against future floods. In his brief the respondent states, in part:

A third ground proposed by petitioner as a reasonable business need to justify its accumulation of earnings and profits was acting as a self-insurer for flood losses. Respondent concedes that this would be a reasonable purpose for which to reserve earnings and profits. The question is how much is a reasonable amount for such a reserve.

Respondent points out that petitioner computed its flood loss in 1957 on the gross-profits method, which included the profit petitioner intended to make on the merchandise destroyed and argues that petitioner should not be entitled to include in its flood-loss reserve an amount for loss of profits. We agree. He then suggests that approximately $11,000 should be the upper limit of any reserve for flood losses. We have found as a fact that it was reasonable for petitioner to retain sufficient earnings and profits to permit it to be a self-insurer against floods for each year to the extent of $11,000.

*Expansion.*—The elimination of the possibility of future flood losses was one of the reasons which caused petitioner to start looking for a new store location in the late spring of 1957. Other reasons were: Petitioner was cramped for space, did not have room to carry the line and selection of goods it wanted to carry, and had to store merchandise, purchased in advance, in the warehouse of A. B. Wholesale, Inc. What the reasonable needs of a business are, is, at first instance, a question for the officers and directors of the corporation, and we have often said that we should be reluctant to substitute our business judgment for that of the corporate management. *Crawford County Printing & Publishing Co.*, 17 T.C. 1404, 1414; *Bremerton Sun Publishing Co.*, *supra; Faber Cement Block Co.*, *supra.*

We have set out in our findings under the heading of "Expansion" in some detail the continual and persistent attempts on the part of petitioner to obtain a new and larger location which did not cease until 1966 when petitioner acquired the Belcher property on which it built a new store at a total cost for land, building, and fixtures of $303,099.07 and had to borrow $240,000 to finance the undertaking. Petitioner established the facts set out in our findings, mainly through the frank and undisputed testimony of its two vice presidents, E. M.

Cecil and K. A. Ammar, Jr. Respondent has objected throughout his reply brief to petitioner's requested findings made on the basis of such testimony on the ground that petitioner's requested findings merely state a conclusion that "petitioner" contacted the various real estate owners, namely, the Morgan heirs, Amy Lee Powers, the Breeding heirs, Edward Taylor, and Quellia R. Belcher, contending that it was not petitioner who contacted these parties but rather it was E. M. Cecil and K. A. Ammar, Jr., and the evidence does not show that these individuals were acting for petitioner. There is, in our opinion, no merit in such a contention. A corporation is an artificial person and can act only through its elected officers and directors. Looking at the entire record, including the minutes of the meetings of the board of directors, and the ultimate purchase of the Belcher property, it is clear that Cecil and K. A. Ammar, Jr., were at all times acting for petitioner in their continual and persistent attempts to obtain new and larger quarters for petitioner.

Respondent also contends that section 537 was only intended to cover a case where the taxpayer had specific and definite plans for the acquisition of buildings or equipment and that it would not apply where the future plans were vague and indefinite or where the execution of the plans had been postponed indefinitely, citing sec. 1.537-1(b)(1), Income Tax Regs.[13]

We think the regulations tend to support petitioner rather than to militate against its contentions. Beginning with the big flood in 1957, petitioner seriously began to look for larger and better quarters. Grundy was a small town and the real estate situation was controlled by a small number of people. The property in which petitioner conducted its store, as well as the property next door, was owned by the Morgan heirs, with whom petitioner commenced negotiations for more space. When petitioner saw it could not acquire the space it wanted from the Morgan heirs, it contacted Amy Lee Powers, and bought out her inventory of goods, thinking this might enable it to buy the building. Powers, however, asked too high a price for the building

---

[13] Sec. 1.537–1 Reasonable needs of the business.

(b) *Reasonable anticipated needs.* (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business.

and petitioner did not buy. As stated in our findings, petitioner continued to make other contacts, and never ceased until it was successful in acquiring the Belcher property.

We think petitioner has definitely established that it needed to accumulate earnings and profits for the future needs of its business. We think the plans for the use of such accumulation were specific, definite, and feasible and were never postponed but were, in fact, actually accomplished. The respondent, in quoting from section 1.537–1 (b) (1), *supra,* omitted the sentence reading "Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business." We think the facts and circumstances established by petitioner clearly show that petitioner needed to accumulate earnings and profits for its future needs and that such accumulation was used within a reasonable time under the circumstances. In his reply brief, the respondent states as being "incredible" petitioner's assertion that it had plans for expansion initiated in 1957, but not culminated until 10 years later. Under the circumstances established by petitioner, and set out herein, we do not think the time element is controlling. Even under the 1939 Code, before the "reasonably anticipated needs of the business" rule was enacted, we held that a taxpayer corporation could "accumulate its earnings until the expansion can be timely undertaken." *Crawford County Printing & Publishing Co., supra* at 1414. Cf. *Faber Cement Block Co., supra,* where the taxpayer's expansion program commenced in 1957 and continued through 1966.

The expansion plans when completed cost petitioner a total of $303,099.07 of which petitioner had to borrow $240,000. During the years 1963, 1964, and 1965 petitioner paid total dividends of $56,500 which were approximately equal to petitioner's net income after taxes for those years. In view of the large amount petitioner had to borrow to consummate its expansion plans, K. A. Ammar, Jr., testified "I feel we made a bad misjudgment in paying them. We should not have paid them although we did."

From all of the evidence pertaining to petitioner's expansion program we have found as a fact that it was reasonable for petitioner to retain sufficient earnings and profits to permit it to expand its business for each of the years here involved to the extent of at least $200,000.

We now compare petitioner's availabilities, column (3) of our table, with petitioner's total needs of business, column (6) of our table, as we did in *Faber Cement Block Co., supra.* The result of the compari-

son is a deficiency in availabilities or shortage of working capital, column (7) of our table, of the following amounts:

| Year | Shortage |
|------|----------|
| 1959 | $185,033.97 |
| 1960 | 203,141.90 |
| 1961 | 180,272.50 |
| 1962 | 122,648.12 |

Respondent also contends that under section 1.535–3(b)(1)(ii), Income Tax Regs.,[14] we must also consider whether the earnings and profits accumulated in years prior to the taxable years were sufficient to meet the reasonable needs of petitioner's business. These accumulated earnings and profits are set forth in column (1) of our table.

We have set out in our findings a comparison of petitioner's working capital, column (3) of our table, with petitioner's balance sheets for the years in question. This comparison shows that by far the greater proportion of the accumulated earnings and profits (surplus) is already reflected in petitioner's working capital set out in column (3) of our table, and that the difference between the total capital (capital stock and surplus) and the working capital are assets other than the current assets, as follows: Buildings, etc., 1959, $6,296.49; 1960, $11,687.75; 1961, $2,734.92; 1962, $1,183.53.

Subtracting the capital stock from this difference would leave only ($3,703.51), $1,687.75, ($7,265.08), and ($8,816.47) or a minus quantity of accumulated earnings and profits of prior years to be taken into consideration under the regulations set out in footnote 14, thus demonstrating that the said regulations are not applicable in the instant case.

We have found as an ultimate fact that during the years in question petitioner did not permit its earnings and profits to accumulate beyond the reasonable needs, including the reasonably anticipated needs, of its business; and that petitioner's undistributed earnings and profits, after taxes, for each of those years were retained for the reasonable needs of its business. Cf. *Mohawk Paper Mills, Inc.* v. *United States*, 262 F. Supp. 365 (D.N.Y. 1966), and *New England Wooden Ware* v. *United States*, 289 F. Supp. 111 (D. Mass.). In the *New England Wooden Ware* case Chief Judge Wyzanski said, in part:

A good opinion keeps to the major facts * * *

Here the major fact is that such earnings and profits as were accumulated were for reasonably anticipated future needs. [289 F. Supp. at 119.]

[14] Sec. 1.535–3 Accumulated earnings credit.

(b) *Corporation which is not a mere holding or investment company—(1) General rule.* * * *

(ii) In determining whether any amount of the earnings and profits of the taxable year has been retained for the reasonable needs of the business, the accumulated earnings and profits of prior years will be taken into consideration. Thus, for example, if such accumulated earnings and profits of prior years are sufficient for the reasonable needs of the business, then any earnings and profits of the current taxable year which are retained will not be considered to be retained for the reasonable needs of the business. See section 537 and §§ 1.537–1 and 1.537–2.

In view of the credit provided for in section 535(c)(1), it is unnecessary for us to consider whether or not petitioner was availed of for the proscribed purpose. *John P. Scripps Newspapers, supra* at 474. In the instant case the credit would be equal to the full amount of the retained earnings. Therefore, even if petitioner were availed of for the proscribed purpose, under section 535(a) the accumulated taxable income, on which section 531 tax is imposed, would be zero and petitioner would owe no section 531 tax. We so hold. In so holding we do not reach the question in *United States* v. *Donruss Co.*, 393 U.S. 297 (1969).

*Decision will be entered for the petitioner.*

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.