Kingsbury Investments, Inc. v. Commissioner.
Kingsbury Invest., Inc. v. Commissioner
Docket No. 580-66.
United States Tax Court
T.C. Memo 1969-205; 1969 Tax Ct. Memo LEXIS 91; 28 T.C.M. (CCH) 1082; T.C.M. (RIA) 69205; September 30, 1969, Filed Chester M. Howe, David E. Place, and Andrew F. Lane, 225 FranklinSt., Boston, Mass., for the petitioner. Rufus E. Stetson, Jr., and A. W. Dickinson, for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies in petitioner's income tax as follows: Fiscal Year Ended
Deficiency
September 30, 1961
$ 99,449.35
September 29, 1962
269,098.98
September 28, 1963
95,469.17
We must decide whether, for each of the taxable years in question, petitioner was availed of for the purpose of avoiding income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed, and is thus subject to the accumulated earnings tax imposed by section 531 of the 1954 Code. [1] This *93 is the only issue before us. [2] 1083 Findings of Fact Some of the facts have been *94 stipulated and are so found. The stipulation and the exhibits attached thereto are incorporated herein by this reference. Kingsbury Investments, Inc., is a New Hampshire corporation having its principal place of business in Keene, New Hampshire, at the time of the filing of its petition herein. Petitioner timely filed its Federal corporation income tax returns for the taxable years in question with the district director of internal revenue, New Hampshire. Pursuant to the provisions of Section 534 the Commissioner notified petitioner of his intent to issue a statutory notice of deficiency for the years 1961, 1962, and 1963 setting forth an amount with respect to section 531 relating to the accumulated earnings tax. By letter dated September 30, 1965, the petitioner submitted to the Commissioner a statement intended to comply with the provisions of section 534(c). This statement set forth the following grounds on which petitioner relies to establish that its earnings and profits have not been permitted to accumulate beyond the reasonable needs of its business: A. Increased inventory requirements totaling an estimated $2,000,000 existed throughout the three year period. B. Increased *95 Plant and Equipment needs of more than $1,000,000 existed throughout the three year period. C. To meet Current Liabilities at the close of the fiscal years ended September 30, 1961, 1962, and 1963, which were, respectively, $1,040,000; $1,730,000 and $1,054,000. D. Key management was in a transitional stage and the new personnel were untested. E. Product Diversification was a significant requirement throughout the periods involved as were the necessity for a Service Center and development of the foreign market potential. F. The necessity existed of continuing dividends at a rate at least approximate to those maintained in the years past. G. The uncertainties of the automobile machine tool makers industry justified a significant reserve to meet unpredictable needs. * * * In summary, the prudent needs of the business of Kingsbury Machine Tool Corporation at the conclusion of each of the fiscal years ended in 1961, 1962, and 1963 were in round figures as follows: "Inventory
$2,000,000
Plant and Equipment
1,250,000
Liabilities
1,000,000
Dividends
600,000
Service Center Foreign Business Acquisitions And
1,250,000
Others
Total
$6,100,000"
By order *96 dated June 5, 1968, this Court granted petitioner's motion that the burden of proof be upon the Commissioner with respect to the grounds set forth in petitioner's statement. Kingsbury Investments, Inc., is presently a personal holding company. Until June 1964, Kingsbury Investments, Inc., was in the machine tool business under the name Kingsbury Machine Tool Corp., a New Hampshire corporation. At that time Kingsbury Machine Tool Corp. (New Hampshire) while retaining cash and securities, sold all of its operating assets, including accounts receivable, inventory, machinery, land and buildings to the newly created Kingsbury Machine Tool Corp. (Delaware), a Delaware corporation. Kingsbury Machine Tool Corp. (New Hampshire) and its successor Kingsbury Investments, Inc., the nominal petitioner herein, are hereinafter sometimes referred to simply as Kingsbury or petitioner. Kingsbury's business since its incorporation in 1928 has been the manufacture of machine tools which are sold in nearly all parts of the United States, most sales being to customers in the automotive industries in Ohio, Indiana, and Michigan. Kingsbury has addressed itself primarily to designing, engineering and manufacturing *97 machines for metal removal in the automotive industry. It manufactures machines used in making carburetors, distributors, automobile transmissions and other small automobile equipment pieces. The pressure toward greater automation in the automotive industry has been constant. Until 1956 the automotive industry employed a dial or radial type columnar machine having a 1084 series of stations on its circumference for performing metal removal operations. Such a machine could be manufactured in about 9 months and cost less than $100,000. The basic machine has been continuously improved during the past decade. The number of stations have increased from about 8 to 18, thus increasing the number of metal removal operations the machine is capable of performing. The cost of the improved radial type machine is around $250,000. Its manufacture requires approximately a year. Each machine is individually manufactured on order. Concurrently with the expanded requirements in the rotary type machine, the pressure toward increased automation in the automotive industry resulted in demand for a machine capable of performing all operations necessary to complete the tooling job on a piece of metal *98 stock. The "inline" machine, having a series of stations in line with one another rather than on the circumference of the machine, is such a machine, having no theoretical limit to the number of operations it is capable of performing. The in-line machine requires one operator to insert the raw-stock metal and remove the tooled component. One in-line machine and one operator replace a number of rotary type machines and their respective operators. Pressure to design and build an in-line machine was brought to bear on Kingsbury Machine Tool Corp. in 1955 by certain of its customers and agents. Kingsbury was reluctant to embark on this new venture recognizing that expenditures in terms of engineering and machinery costs could run well over a half million dollars, while observing at the same time its competitors were encountering difficulties with the new type machines. As of December 1956, Kingsbury had decided that its entrance into the in-line field at that time would be premature. By 1958 it became apparent that Kingsbury's development of an in-line machine was a competitive necessity. The decision was made to enter this field. Kingsbury, however, had had no experience with this type *99 of unit. The early in-lines were multimillion dollar machines for producing large pieces of automotive equipment such as engine blocks, whereas Kingsbury's experience was with small automotive parts. An intensive study program was adopted. Twelve of Kingsbury's top personnel, including its sales manager, service manager and chief engineer, were sent on visitation programs to study the machine and its market. The engineering effort began in 1959 and a working prototype was in operation by September 1961. This prototype consisted of 2 stations plus the track and pallet between them. Buying programs were underway in the automotive industry at that time and Kingsbury wanted to be considered on in-line requests at that time. Kingsbury received requests for bids on in-lines for Ford dated February 9, 1962 and March 23, 1962. Bids were submitted in the amounts of $840,254 and $217,684, respectively. While they received serious consideration from Ford, these bids were unsuccessful. It was not until 1964 that Kingsbury was successful in its bid on an in-line similar to the $840,000 one bid in 1962. In the meantime, Kingsbury had designed, engineered and built three prototype transfer machines *100 of different design in an effort to develop one that would be satisfactory. Increased Plant and Equipment Needs Kingsbury anticipated in 1961 that, if it were successful in its bidding on a major in-line machine, its manufacture of such a machine would necessitate expansion of its plant facilities to accommodate the larger floor space that would be required. Additional machine tools and other equipment also would have to be purchased. While these needs were anticipated in 1961, they did not materialize until 1964 when Kingsbury had successfully bid on a large in-line. The machinery and building requirements of petitioner's machine tool business since September 1962 have totaled in excess of $1,000,000. Extraordinary expenditures for plant expansion and purchase of additional machinery in an amount exceeding $1,000,000 were actually and reasonably anticipated by petitioner as of 1961. Increased Inventory Requirements Kingsbury also anticipated a substantial increase in its cash requirements to finance the increased inventory that would result from a successful in-line bid. Kingsbury's customers did not finance the construction of these machines by the making of progress payments *101 or by any other means. Since Kingsbury's entrance into the manufacture of in-lines, its inventory levels have increased by more than $1,700,000. The increased inventory requirement in an amount of at least $2,000,000 was a reasonably and 1085 actually anticipated need of the business as of 1961. Accumulated Earnings and Profits Petitioner's accumulated earnings and profits and the increase in petitioner's earnings and profits over prior years were as follows: Date
Accumulated Earnings
Increase Over
and Profits
Prior Years
September 30, 1961
$3,002,717.45
$307,163.22
September 29, 1962
3,795,449.97
792,732.52
September 26, 1963
4,025,598.19
230,148.22
Net Working Capital Petitioner's net working capital during the taxable years 1960 through 1963 was as follows: [3] *102 The parties are in dispute as to whether petitioner's investment in Kingsbury Manufacturing Co. should be included in the computation of its net working capital. Kingsbury Manufacturing Co. is a wholly owned subsidiary of petitioner with a net worth of $290,000, $294,600, and $298,085 as of the end of petitioner's fiscal years ended 1961, 1962, and 1963, respectively, as shown in the following summary balance sheet: 9/30/61
9/29/62
9/28/63
Current Assets
$ 21,000
$ 22,600
$ 5,191
Fixed Assets, Net
21,700
20,000
18,282
Other Investments
Cheshire Investments (cost)
110,000
110,000
110,000
Savings Bank Deposits
145,700
151,500
173,323
$255,700
$261,500
$283,323
Total Assets
298,400
304,100
306,796
Total Liabilities
8,400
9,500
8,711
Net Worth
$290,000
$294,600
$298,085
Cheshire Investments, Inc., a wholly owned subsidiary of Kingsbury Manufacturing Co. *103 , had a net worth of $133,300, $134,500, and $135,999 as of the end of petitioner's fiscal years ended 1961, 1962, and 1963, respectively, as shown in the following summary balance sheet: 9/30/61
9/29/62
9/28/63
Current Assets
$ 3,400
$ 8,100
$ 6,559
Fixed Assets, Net
18,100
17,300
16,434
Investments
WBL (various securities) cost
85,000
87,500
87,500
New England Telephone and Telegraph
27,900
28,000
27,949
Pinnacle Mt.
1,000
1,000
1,010
$113,900
$116,500
$116,459
Total Assets
$135,400
$141,900
$139,452
Total Liabilities
2,100
7,400
3,453
Net Worth
$133,300
$134,500
$135,999
Cheshire's investment in Winding Brook Lodge (W.B.L.), a motel and restaurant located in Keene, was made as part of a joint effort of the Keene business community to provide lodging facilities for their respective customers. We have decided that petitioner's continuing investment in this facility does not represent a need of petitioner's business. For this reason, we have treated petitioner's investment in this facility (at cost) as available to meet petitioner's working capital needs. Nor has petitioner shown that Cheshire's fixed assets were related *104 to the conduct of petitioner's machine tool business. Nor do we know anything about petitioner's indirect investment in Pinnacle Mt. Development. As none of Cheshire's investments were sufficiently related to petitioner's business, we have not considered Cheshire's operating needs, if any, as being so related. The figures of $21,700, $20,000 and $18,282 representing Kingsbury's net fixed assets for the fiscal years ended 1961, 1962, and 1963, respectively, apparently represent Kingsbury Manufacturing Co.'s ownership of a building which it rented to petitioner. Obviously this building, which was used in petitioner's business, cannot be considered available to meet petitioner's capital requirements. Petitioner has not shown, however, that any amount was required to meet the capital needs of maintaining this rental property - the maintenance of this property constituting the only business of Kingsbury Manufacturing Co. that is related to petitioner's machine tool business. Accordingly, we have included in our computation of petitioner's net working capital the net worth of Kingsbury Manufacturing Co., deducting therefrom only the amounts representing Kingsbury Manufacturing Co.'s fixed *105 assets.
Year
Amount
October 1, 1960
$3,771,100
September 30, 1961
3,925,500
September 29, 1962
4,638,400
September 28, 1963
4,944,603
Working Capital Needs Petitioner required working capital as of the end of the years involved in an amount 1086 at least sufficient to cover its reasonably anticipated cost of operating a single operating cycle. An operating cycle for petitioner consisted of the time required to convert cash into inventory, inventory into sales, and accounts receivable into cash by collection thereof. Petitioner required the following amounts to finance a single operating cycle: Fiscal Year Ended
Net Working
Capital [4]
Requirements
September 30, 1961
$2,806,720
September 29, 1962
2,881,535
September 28, 1963
2,131,762
*106 1087 During the years involved herein there were 115,439 shares of stock of petitioner issued and outstanding. The principal shareholders were the following persons who owned the number of shares indicated for each of the years involved: Number
of
Shares
Shareholder
1961
1962
1963
Chester L. Kingsbury
7,165
7,165
7,305
Winnifred Kingsbury
1,200
1,200
1,200
Total
8,365
8,365
8,505 1088 Number of
Number of Shares
Shares
Shareholder
1961
1962
1963
Shareholder
1961
1962
1963
Edward J.
2,910
1,845
1,845
Henry
0
0
0
Kingsbury
Frechette
Lillian
10,615
10,615
10,615
Priscilla
6,300
6,300
6,300
Kingsbury
Frechette
Total
13,525
12,460
12,460
Total
6,300
6,300
6,300 1089 Petitioner has a long history of paying substantial dividends on a regular basis. During the years involved herein petitioner paid the following dividends shown as a percentage of its net profits: Percent of
Dividend
Dividends
to Net
Fiscal Year Ended
Paid
Profit
September 30, 1961
$277,053.60
47.4
September 29, 1962
277,053.60
67.7
September 28, 1963
369,404.80
55.3
*107 1090 Several of petitioner's shareholders were in tax brackets which exceeded 50 percent for each of the years in question. Increased dividend payments by petitioner would have been taxable to these shareholders at rates exceeding 50 percent. Petitioner has made no loans to shareholders or otherwise made corporate property available to or for the benefit of its shareholders. Petitioner had a longstanding policy against borrowing money. Opinion We must decide whether during its taxable years 1961 through 1963, petitioner was availed of for the purpose of avoiding income tax to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed, thus rendering it liable for the accumulated earnings tax imposed by section 531. See sections 531 through 537 of the 1954 Code, as amended, the pertinent provisions of which are set out below. [5]Section 531 imposes the accumulated earnings tax; section 532 provides that every corporation formed or availed of for the purposes of avoiding the income tax of its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed shall be subject to the tax; section *108 533 provides that the fact that earnings and profits are permitted to accumulate "beyond the reasonable needs of the business" shall be determinative of such purpose unless the corporation by the preponderance of the evidence shall prove to the contrary; section 534 deals with the burden of proof; section 535 defines "accumulated taxable income" upon 1091 which the tax under section 531 is based; section 536 is not here material; and section 537 provides that the term "reasonable needs of the business" includes the reasonably anticipated needs of the business. *109 This Court has recently stated that if a corporation's earnings and profits were required for the reasonable needs of the business, including the reasonably anticipated needs, the corporation is not subject to the accumulated earnings tax. Magic Mart, Inc., 51 T.C. 775 (1969). The central issue, then, becomes "the reasonable needs of the business." Faber Cement Block Co., 50 T.C. 317 (1968). Whether petitioner's accumulated earnings and profits were required to meet those needs involves essentially a factual determination. Faber Cement Block Co., supra. We have made no fact findings with respect to petitioner's grounds C,D,E,F, or G, alleged in its section 534 statement to establish that its earnings and profits have not been permitted to accumulate beyond the reasonable needs of its business. In our view, petitioner's alleged anticipated needs for increased inventory and for plant and equipment expansion, combined with its actual current needs for each year, expressed in terms of its net operating cycle needs, make such findings unnecessary; *110 these needs alone exceed petitioner's net working capital available to meet more needs. The parties seem to agree that petitioner required working capital at the end of each of the years involved in an amount at least sufficient to cover its reasonably anticipated cost of operating for a single operating cycle. However, they are in dispute as to the amount of such anticipated costs for each year. We have found the costs of operating for a single cycle to be $2,806,720, $2,881,535, and $2,131,762, respectively, for the years 1961, 1962, and 1963. In so finding, we have adhered closely to the general guidelines set forth in Magic Mart, Inc., supra, and the cases cited therein. Our computation of those needs is set out in footnote 4 to our findings of fact. The differences between petitioner's net working capital, $3,925,500, $4,638,400, and $4,944,603, respectively, for the years 1961, 1962, and 1963 and petitioner's working capital needs, $2,806,720, $2,881,535, and $2,131,762, respectively, for the years 1961, 1962, and 1963, being $1,118,780 in 1961, $1,756,865 in 1962, and $2,812,841 in 1963, represent working capital which was available to meet the reasonably anticipated *111 needs of petitioner's business. We have found those needs to be at least $3,000,000 for each year, $1,000,000 for plant expansion and the purchase of additional machinery and $2,000,000 for anticipated increased inventory requirements. Accordingly, we find that petitioner's business needs exceeded its net working capital available to meet those needs in each of the years involved herein. It follows that petitioner is not subject to the accumulated earnings tax. Magic Mart, Inc., supra. The Commissioner contends that Kingsbury did not actually anticipate the alleged anticipated needs for inventory, and for plant expansion and additional equipment. Even though subsequent events may have demonstrated that petitioner's retained profits have not exceeded the actual needs of petitioner's business, the crucial question relates to petitioner's intentions at the time of the accumulations. A purpose to evade tax with respect to its shareholders must not have been present when the earnings and profits were allowed to accumulate. United States v. Donruss Co., 393 U.S. 297 (1969). *112 Subsequent events cannot be used to show the existence of a plan to use the accumulations or the reasonableness of an accumulation if no subjective determination of need had been made at the time of the accumulation. Faber Cement Block Co., supra. Specifically, the Commissioner's regulations state that in order to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation "and the corporation must have specific, definite, and feasible plans for the use of such accumulation." Section 1.537-1(b)(1), Income Tax Regs. The purpose behind this requirement is obvious - the courts must be able to distinguish between corporations which have allowed their earnings to accumulate for the purpose of meeting business needs and corporations which have accumulated with a purpose to evade taxes with respect to their shareholders and which later seek to justify the accumulation in terms of bogus needs, fabricated in the light of hindsight for the *113 purpose of defending against the accumulated earnings tax. We think Kingsbury's plans for the use of its accumulated earnings were "specific, definite, and feasible" within the meaning of the above-quoted 1092 regulation. Its entrance into the in-line field, specifically into the manufacture of the large in-lines, was recognized as a competitive necessity prior to 1961. During the several years preceding, and during 1961 and 1962, it was in active pursuit of in-line business. It sent its engineers out into the field to study its competitors' in-lines; it manufactured two prototype transfer machines and engineered basic improvements in the in-line; it bid for the manufacture of numerous in-lines, including a bid for an $840,000 in-line for Ford in 1962. These actions speak louder than words. We are persuaded that the decision to enter the inline field had been made prior to 1961. In light of the circumstances then known to petitioner's management, the full implementation of this decision, depending upon the success of petitioner's bids, would of necessity require extraordinary capital expenditures of $3,000,000. The fact that petitioner did not have blueprints for its plant expansion, *114 when the nature and extent of that expansion would depend upon future developments should not be fatal. We are persuaded that needs in these amounts were reasonably and actually anticipated. Petitioner's plans were as specific, definite and feasible as was possible in light of the extraordinary nature of its business. We are impressed with the fact that to a very large degree the anticipated needs actually materialized upon petitioner's successful entrance into the in-line business in 1964. Faber Cement Block Co., supra.
Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise specified. ↩
2. Petitioner claims overpayments of tax for each of these years for the Commissioner's "disallowance" of deductions for compensation paid to Henry M. Frechette. Compansation paid to him was $24,517.63, $25,560.63, and $29,444.05 for petitioner's fiscal years ended 1961, 1962, and 1963 respectively. These amounts appear in "Schedule E" of petitioner's returns for each of these years and were claimed as deductions in computing petitioner's taxable income. So far as we can ascertain, these deductions were not disallowed in the Commissioner's statutory notice of deficiency. Accordingly, we cannot understand petitioner's allegation of overpayments in taxes for these years. However, even if the issue of reasonable compensation were properly before us, we could not decide it in favor of petitioner, who must carry the burden of proof, because it has offered no evidence whatsoever as to the nature and extent of the services that Henry M. Frechette actually rendered to petitioner during these years.↩
3. The net working capital is computed as follows: 10/1/60
9/30/61
9/29/62
9/28/63
Current assets
$2,589,800
$2,483,500
$2,851,600
$2,532,000
Short-term securities
942,300
541,400
1,335,000
878,400
Long-term investments Excludes: 1. Investment in Fitchburg Foundry, Inc. 2. Investment in Kingsbury Manufacturing Co. 3. Cash surrender value - officer's life insurance. Includes: 1. Municipal bonds. 2. U.S. Treasury Bonds. 3. U.S. Treasury Notes. 4. Certificates of deposit.
*
1,037,900
1,417,400
1,668,700
1,916,200
Savings bank deposits
156,700
163,000
169,700
254,000
Liquid Assets
$4,726,700
$4,605,300
$6,025,000
$5,580,600
Less: Current Liabilities
1,218,400
948,100
1,661,200
915,800 Net Working Capital $3,508,300 $3,657,200 $4,363,800 $4,664,800
Investment in Kingsbury Manu- facturing Co. 262,800 268,300 274,600 279,803
Increased Net Working Capital $3,771,100 $3,925,500 $4,638,400 $4,944,603 ↩
4. The Commissioner computes petitioner's net operating cycle needs as follows: Fiscal Year Ended 9-30-61
Days
Percent of Year
Inventory Cycle - Schedule 1
167.4
Accounts Receivable Cycle - Schedule 2
44.1
Accounts Payable - Schedule 3
(22.5)
Operating Cycle
189.0
51.78%
Cost of Goods Sold and Expenses - Schedule 3
$4,210,501.07
Net Working Capital Requirements for one Operat-
$2,180,197.45
ing Cycle (51.78% of $4,210,501.07)
Fiscal Year Ended 9-29-62
Inventory Cycle - Schedule 1
124.6
Accounts Receivable Cycle - Schedule 2
37.8
Accounts Payable - Schedule 3
(18.2)
Operating Cycle
144.2
39.51%
Cost of Goods Sold and Expenses - Schedule 3
$5,895,121.45
Net Working Capital Requirements for one Operat-
$2,329,162.48
ing Cycle (39.51% of $5,895,121.45)
Fiscal Year Ended 9-28-63
Inventory Cycle - Schedule 1
128.5
Accounts Receivable Cycle - Schedule 2
51.2
Accounts Payable Cycle - Schedule 3
(26.0)
Operating Cycle
153.7
42.11%
Cost of Goods Sold and Expenses - Schedule 3
$4,593,325.31
Net Working Capital Requirements for one Operat-
$1,934,249.29
ing Cycle (42.11% of $4,593,325.31)
Schedule 1 - Inventory Cycle
September
September 29, 1962
September 28, 1963
30, 1961
Inventory
Inventory
(Omit
Turnover
Days
(Omit 000)
Turnover
Days
000)
Sept. 30
$1,162
2.52495
144.6
$1,402
3.07418
118.7
Oct. 31
1,126
2.60568
140.1
1,491
2.89068
126.3
Nov. 30
1,208
2.42881
150.3
1,570
2.74522
133.0
Dec. 31
1,242
2.36232
154.5
1,571
2.74348
133.0
Jan. 31
1,413
2.07643
175.8
1,598
2.69712
135.3
Feb. 28
1,601
1.83260
199.2
1,584
2.72096
134.1
Mar. 31
1,662
1.76534
206.8
1,605
2.68636
135.9
Apr. 30
1,526
1.92267
189.8
1,673
2.57621
141.7
May 31
1,523
1.92646
189.5
1,481
2.91020
125.4
June 30
1,245
2.35663
154.9
1,374
3.13683
116.4
July 31
1,216
2.41283
151.3
1,407
3.06326
119.2
Aug. 30
1,165
2.51845
144.9
1,409
3.05891
119.3
Sept. 30
1,402
2.09272
174.4
956
4.50837
81.0
Totals
28.82489
2176.1
38.81070
1619.3
Average
2.21738
167.4
2.98544
124.6
Cost of Goods
$2,934
$4,310
sold
Schedule 1 - Inventory Cycle September
30, 1961
Inventory
(Omit 000)
Turnover
Days
Sept. 30
$ 956
3.36925
108.3
Oct. 31
1,119
2.87846
126.8
Nov. 30
1,150
2.80087
130.3
Dec. 31
1,170
2.75299
132.6
Jan. 31
1,176
2.73895
133.3
Feb. 28
1,213
2.65540
137.5
Mar. 31
1,174
2.74361
133.0
Apr. 30
1,266
2.54233
143.5
May 31
1,071
3.00747
121.4
June 30
1,105
2.91493
125.2
July 31
1,187
2.71356
134.5
Aug. 30
1,010
3.18911
114.5
Sept. 30
1,143
2.81802
129.5
Totals
37.12685
1670.4
Average
2.85591
128.5
Cost of Goods
$3,221
sold
Note 1: Turnover: (Cost of goods)/(Inventory Note 2: Days. (365 Days per year)/(Turnover) Schedule 2 - Accounts Receivable Cycle September
September 29, 1962
September 28, 1963
30, 1961
Accounts
Accounts
Receivable
Receivable
(Omit 000
Turnover
Days
(Omit 000)
Turnover
Days
Sept. 30
$ 538
10.75051
39.9
$ 512
17.10742
21.3
Oct. 31
513
11.28070
32.4
546
16.04212
22.8
Nov. 30
372
15.55645
23.5
633
13.83728
26.4
Dec. 31
336
17.22321
21.2
965
9.07668
40.2
Jan. 31
501
11.55090
31.6
1,272
6.88601
53.0
Feb. 28
302
19.16225
19.0
909
9.63586
37.9
Mar. 31
566
10.22438
35.7
1,456
6.01580
60.7
Apr. 30
1,045
5.53780
65.0
955
9.17173
39.8
May 31
1,209
4.43780
76.3
1,188
7.37290
49.5
June 30
1,325
4.36755
83.6
1,000
8.75900
41.7
July 31
973
5.94758
61.4
413
21.20823
17.2
Aug. 30
890
6.50225
56.1
428
20.34089
17.9
Sept. 30
512
11.30273
32.3
1,519
5.76629
63.3
Totals
134.19891
572.9
151.22021
491.7
Average
10.32299
44.1
11.63232
37.8
Sales
$5,787
$8,759
Schedule 2 - Accounts Receivable Cycle
September
30, 1961
Accounts
Receivable
(Omit 000)
Turnover
Days
Sept. 30
$1,519
4.19026
87.1
Oct. 31
1,284
4.95717
73.6
Nov. 30
1,053
6.04462
60.4
Dec. 31
1,002
6.35230
57.5
Jan. 31
595
10.69748
34.1
Feb. 28
593
10.73356
34.0
Mar. 31
1,063
5.98777
61.0
Apr. 30
553
11.50990
31.7
May 31
1,160
5.48707
66.5
June 30
594
10.71549
34.1
July 31
607
10.48600
34.8
Aug. 30
868
7.33295
49.8
Sept. 30
707
9.00283
40.5
Totals
103.49746
665.1
Average
7.96134
512.2
Sales
$6,365
Note 1: Turnover: (Sales)/(Accounts receivable) Note 2: Days: (365 Days per year)/(Turnover) - continued - 1088 Schedule 3 - Accounts Payable
Cycle
Accounts Payable 9-30-60
Trade Creditors
$200,098.59
Other Liabilities Accrued & Payable
68,273.53
$268,372.12
Accounts Payable 9-30-61
Trade Creditors
$116,462.15
Other Liabilities Accrued & Payable
133,905.56
250,367.71
Accounts Payable 9-29-62
Trade Creditors
$113,254.91
Other Liabilities Accrued & Payable
223,065.36
336,320.27
Accounts Payable 9-28-63
Trade Creditors
$ 65,955.01
Other Liabilities Accrued & Payable
252,464.59
318,419.60
Average Accounts Payable
Beginning
End of Year
Average
Fiscal Year Ended 9-30-61
$268,372.12
$250,367.71
$259,369.91
Fiscal Year Ended 9-29-62
250,367.71
336,320.27
293,343.99
Fiscal Year Ended 9-28-63
336,320.27
318,419.60
327,369.94
Accounts Payable Turnover
Fiscal Year
Ended
9-30-61
9-29-62
9-28-63
Cost of Goods Sold - Line 2 Form
$2,934,916.72
$4,310,117.89
$3,221,042.46
1120
Total Deductions - Line 26 Form
1,871,782.79
2,561,447.94
2,014,227.46
1120
$4,806,699.51
$6,871,565.83
$5,235,269.92
Less: Depreciation - Line 21
$ 184,470.01
$ 199,186.87
$ 211,630.76
Form 1120
Contributions - Line 19
59,080.00
105,000.00
66,800.00
Pension Plan - Line 25
138,599.41
109,569.05
114,183.61
Profit Sharing Plan - Line 25
214,049.02
562,688.46
249,330.24
$ 596,198.44
$ 976,444.38
$ 641,944.61
Relevant Operating Costs and
Cost
of Goods Sold
$4,210,501.07
$5,895,121.45
$4,593,325.31
Accounts Payable Turnover
(Relevant
Costs Average Accounts Payable)
16.23
20.10
14.03
Accounts Payable - Days before
22.5
18.2
26.0
payment Due(365 Days Accounts
Payable Turnover) - continued - By similar method of computation, petitioner computes its net operating cycle needs to be as follows: Fiscal Year Ended
September 30, 1961
$3,349,875
September 29, 1962
3,310.700
September 28, 1963
3,202,820 The substantial difference in results is the consequence of the parties' selection of different figures to be employed in the computation. For example, while the Commissioner computed an average inventory cycle for 1961 of 167.4 days, the petitioner computed an inventory cycle for 1961 of 206.8 days, the period of time required to turn over its peak inventory of $1,662,000 held as of March 31, 1961. Similarly the petitioner computed an accounts receivable cycle of 83.6 days for 1961, the period of time required to turn over its peak accounts receivable of $1,325,000 which occurred as of January 30, 1961. This compares with the Commissioner's computation of an average accounts receivable cycle of 44.1 days for 1961. Similarly petitioner chose its average trade accounts payable turnover for 1961 of 10.1 days as compared with the 22.5 days average turnover of trade and other accounts payable computed by the Commissioner. We reject both parties' computations. Petitioner's business is seasonal, involving an inventory buildup during the manufacturing process which "peaks" during the March to May period. Accounts receivable similarly are seasonal. In these circumstances, the Commissioner's computation of average working cycle needs does not reflect the demands upon capital of petitioner's actual working cycle. See Magic Mart, Inc., 51 T.C. 775 (1969). On the other hand, petitioner computes its working cycle needs by employing peak inventory turnover, peak accounts receivable and average trade accounts payable (as opposed to average trade and other accounts payable). Peak inventory and peak accounts receivable, however, do not occur in conjunction with each other; employment of both these figures we think results in an unreasonably inflated needs figure. We think petitioner's true operating cycle needs are most accurately reflected by computing the turnover of petitioner's peak inventory plus accounts receivable, i.e., choosing for each year the month in which the sum of inventory plus accounts receivable exceeds the sum of those figures for any other month, and subtracting therefrom the average turnover of all accounts payable. Petitioner's net working capital requirements, as we find them for each year, are computed as follows (using figures found in the schedules to the Commissioner's computations reproduced above): ↩
Fiscal Year Ended 9-30-61
Days
Percent
of Year
Inventory Cycle - May
189.5
Accounts Receivable Cycle - May
76.3
Days
Percent
of Year
Accounts Payable Cycle - Average
(22.5)
243.3
66.66%
Cost of Goods Sold and Expenses
$4,210.501
Net Working Capital Requirements for one
$2,806,720
Operating Cycle (66.66% of $4,210,501)
Fiscal Year Ended 9-29-62
Inventory Cycle - March
135.9
Accounts Receivable Cycle - March
60.7
Accounts Payable Cycle - Average
(18.2)
178.4
48.88%
Cost of Goods Sold and Expenses
$5,895,121
Net Working Capital Requirements for one
$2,881,535
Operating Cycle (48.88% of $5,895,121)
Fiscal Year Ended 9-28-63
Inventory Cycle - September
108.3
Accounts Receivable Cycle - September
87.1
Accounts Payable Cycle - Average
(26.0)
169.4
46.41%
Cost of Goods Sold and Expenses
$4,593,325
Net Working Capital Requirements for one
$2,131,762
Operating Cycle (46.41% of $4,593,325)
5. SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxtable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of - (1) 27 1/2 percent of the accumulated taxable income not in excess of $100,000, plus (2) 38 1/2 percent of the accumulated taxable income in excess of $100, 000 SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. - The accumulated earnings tax imposed by section 531 shall apply to every corporation * * * formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. * * * SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose. - For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. * * * SEC. 534. BURDEN OF PROOF. (a) General Rule. - In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall - (1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection. (b) Notification by Secretary. - Before mailing the notice of deficiency referred to in subsection (a), the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. * * * (c) Statement by Taxpayer. - Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. * * * SEC. 535. ACCUMULATED TAXABLE INCOME. (a) Definition. - For purposes of this subtitle, the term "accumulated taxable income" means the taxable income, adjusted in the manner provided in subsection (b), minus, * * * the accumulated earnings credit (as defined in subsection (c)). (b) Adjustments to Taxable Income. - For purposes of subsection (a), taxable income shall be adjusted as follows: (1) Taxes. - There shall be allowed as a deduction Federal income and excess profits taxes * * * accrued during the taxable year * * *. * * * (c) Accumulated Earnings Credit. - (1) General rule. - For purposes of subsection (a), in the case of a corporation * * * the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business * * * * * * SEC. 537. REASONABLE NEEDS OF THE BUSINESS. For purposes of this part, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business.↩