DELAWARE TRUCKING COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Delaware Trucking Co. v. Commissioner
Docket No. 8211-71.
United States Tax Court
T.C. Memo 1973-29; 1973 Tax Ct. Memo LEXIS 257; 32 T.C.M. (CCH) 105; T.C.M. (RIA) 73029; February 7, 1973, Filed Lester M. Ponder, for the petitioner. James J. McGrath, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: 2 Taxable Year
Deficiency 1967
$16,372.28
1968
29,558.47
1969
16,841.64
The only issue to be decided is whether the petitioner is subject to the accumulated earnings tax imposed by section 531, Internal Revenue Code of 1954, [1] for the years 1967 through 1969. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. Delaware Trucking Company, Inc. (herein called petitioner) is an Indiana corporation. Its principal office was located in Muncie, Indiana, when it filed its petition in this proceeding. For the taxable years ended December 31, 1967, 1968 *259 and 1969 the petitioner timely filed Federal corporate income tax returns with the district director of internal revenue at Indianapolis. The petitioner used the accrual method of accounting. During the years in question, and for many prior years, petitioner was engaged in the trucking business as an interstate limited common carrier under jurisdiction of the Interstate Commerce Commission 3 with authority to haul auto parts and iron and steel articles from New Castle and Hagerstown, Indiana, to Detroit, Michigan. The Chrysler Corporation was petitioner's major customer during the years 1967 through 1969 with petitioner hauling primarily from Chrysler's New Castle, Indiana, plant (a short distance from Muncie) to Detroit, and carrying other automotive-related products on its return trips. During the taxable years 1966 to 1970, inclusive, petitioner received the following total amount of gross trucking receipts and the following approximate amounts of gross trucking receipts from the Chrysler Corporation: 1966
1967
1968
1969
1970
Total Gross Trucking Receipts
$638,744
$561,490
$747,885
685,079
$742,532
Gross Chrysler Trucking Receipts
629,648
550,489
734,885
670,079
725,024
*260 Petitioner had no written contract, nor an oral fixed-period contract, with Chrysler, during or prior to the year 1967. Chrysler could have terminated petitioner at will. Chrysler also used rail transportation from its New Castle plant to Detroit during the years 1967 through 1969. This was a distinct threat to petitioner's volume of business. Petitioner's gross receipts from Chrysler 4 declined in 1967 and 1969, compared to 1968, because of Chrysler's policy to use cheaper rail service as much as possible. Petitioner retained its Chrysler business only because of its better and faster service. In addition to rail service, the trend toward acquiring or leasing hauling equipment by large corporations represents another threat to petitioner's business. Chrysler could have purchased or leased the same equipment used by petitioner and hauled its own goods. Petitioner's rates are prescribed by authority of the Interstate Commerce Commission. Petitioner's rates are for a "low rated class of freight." It hauls only in truckloads. Less than truckload rates are higher than for truckloads. Petitioner's drivers rates were the top wages under the Teamsters Union Master Contract, *261 which was negotiated industry-wide for the State of Indiana and not by petitioner separately. It was petitioner's policy to finance its operations from income rather than by borrowing. During the years in question the petitioner's issued and outstanding common and preferred stock was owned as follows: 5 COMMON STOCK SHARES
1967
1968
1969 Marguerite M. Oliver
95
95
95
Evelyn S. Snyder
25
25
25
Osa Sisk (unrelated to Mrs. Oliver or Mrs. Snyder)
10
10
10
Trustee under the Will of Hortance L. Oliver (husband of Mrs. Oliver)
355
355
355
Edward Oliver)
10
-0-
-0-
Treasury
5
15
15
TOTAL
500
500
500 PREFERRED STOCK Evelyn Snyder
50
50
50
Trust under Oliver Will
1
1
1
Osa Sisk
20
20
20
Mrs. Oliver
150
126
102
Edward Oliver
20
-0-
-0-
TOTAL
241
197
173
During these years the petitioner's officers were: President - Evelyn S. Snyder Vice President - Marguerite M. Oliver Secretary-Treasurer - Osa M. Sisk Petitioner's directors during this period were: Florence O. Sowers, Evelyn S. Snyder, Dawn Q. Snyder and Osa M. Sisk. Dawn Q. Synder and Evelyn S. Snyder *262 were husband and wife, Florence O. Sowers was the mother of Evelyn S. Snyder and Osa M. Sisk was unrelated to the other three directors. Marguerite M. Oliver was 6 the stepmother of Florence O. Sowers and the stepgrandmother of Evelyn S. Snyder. Petitioner's net profit (or loss) per books for the taxable years 1956 to 1971, inclusive, and its accumulated earnings and profits per books as of December 31 of such years were as follows: Net Profit (Loss)
Retained Earnings December 31, 1956
$4,398.62
$81,184.97
December 31, 1957
(10,705.09)
91,890.06
December 31, 1958
(20,991.38)
70,898.68
December 31, 1959
3,950.94
74,849.62
December 31, 1960
21,850.64
96,700.28
December 31, 1961
408.85
97,109.13
December 31, 1962
6,549.84
103,658.97
December 31, 1963
24,164.62
127,823.59
December 31, 1964
62,286.60
190,110.19
December 31, 1965
62,964.70
253,074.87
December 31, 1966
54,730.10
307,804.97
December 31, 1967
63,859.91
368,515.74
December 31, 1968
92,861.22
461,376.96
December 31, 1969
60,658.33
522,035.29
December 31, 1970
78,527.90
600,563.19
December 31, 1971
36,640.13
637,203.32
Petitioner's operating expenses *263 (including cost of goods sold), the amounts of depreciation included in such operating expense and net sales for the taxable years and receivables at the beginning and the end of the taxable years, were as follows: 1967
1968
1969 Operating Expenses
$483,482
$609,161
$616,436
Less: Depreciation
37,451
36,509
31,995
Operating Costs
$446,031
$572,652
$584,441 7
Net Sales
$594,566
$786,144
$717,018
Receivables: (as of January 1)
54,592
69,191
76,657
(as of December 31)
69,191
76,657
62,696
Petitioner required the retention of working capital as of the end of each of the taxable years involved at least in an amount sufficient to cover its reasonably anticipated cost of operating for a single operating cycle, plus an additional amount approximately 75 percent thereof. Such additional amount was necessary because of increasing labor costs and other increased expenses caused by inflationary pressures. An operating cycle for petitioner consisted of the period of time required to convert cash into sales and accounts receivable, and then converting sales and accounts receivable into cash by collection thereof. Petitioner had no inventory *264 which had to be taken into account in its one cycle working capital computation. Petitoner's operating cycle for each of the taxable years involved reduced to a decimal part of a year was as follows: 1967
11.558
1968
9.67
1969
12.64
The amounts of the single operating cycle costs, plus amounts to reflect the approximate 75 percent addition for increased labor 8 and other expenses, which were the amounts of working capital reasonably anticipated by petitioner as being necessary to finance its cost of operations, were as follows: One Cycle Amount
75% Addition
Total 1967
$51,552
$ 38,934
90,486
1968
55,375
41,822
97,197
1969
73,873
55,792
129,665
Petitioner's working capital ("net liquid assets") as of the end of the taxable years in issue was as follows:
1967
1968
1969 Liquid Assets
Petty Cash
$50.00
50.00
50.00
Cash in Bank
160,408.96
188,804.12
184,461.96
Savings Accounts
29,538.81
30,909.28
32,399.54
Time Deposits
27,500.00
27,500.00
27,500.00
Accounts Receivable
86,368.50
77,858.74
62,914.38
U.S. Savings Bonds
44,100.00
44,100.00
44,100.00
Dreyfus Investment Program
16,763.18
18,730.40
16,504.54
Investors Stock Fund, Inc.
32,564.53
23,751.54
Industrial Trust Bank Stock
2,125.00
$364,729.45
$420,517.07
$393,806.96
Less: Current Liabilities
125,182.52
159,885.81
91,862.93
Net Liquid Assets
$239,546.93
$260,631.26
$301,944.03
*265 Petitioner's operating expenses were $428,115, $551,278 and $568,421 for the taxable years 1967, 1968 and 1969, respectively. During the taxable years 1968, 1969 and 1970, petitioner acquired the following fixed assets: 9 1968 Land
$22,800.00
Buildings
37,200.00
2 Dodge Trucks
30,031.41
2 Trailers
10,498.00
1 Air Conditioner
345.92
Total
$100,875.33 1969 Dodge Truck
$16,448.92
2 Semi-trailers
10,716.00
2 Semi-trailers
11,100.00
Burroughs Checkwriter
229.50
1 Hyster Forklift Truck
16,405.00
Total
$54,899.42 1970 Dodge Truck
$18,110.91
Towmotor Lift Truck
850.00
2 Carrier Window Air Conditioners
468.10
A. B. Dick Copies
590.00
Remington Typewriter
214.60
Land
5,000.00
Remodel Mulberry Street Property
6,536.69
Total
$31,770.30 1971 Total
$78,701.27
Petitioner's management usually planned its fixed asset acquisitions two years ahead.Petitioner needed to retain earnings in the respective amounts of $155,774.75, $86,669.72 and $110,471.57, the 10 totals of the respective subsequent two-year period, as of December 31, 1967, December 31, 1968, and Decemcer 31, 1969, for *266 acquisition of fixed assets and reasonably anticipated such needs as of those dates. During the taxable years 1967, 1968 and 1969, petitioner deducted depreciation on its trucks and trailers under the double declining balance method compared to straight-line depreciation in the respective amounts of $7,525, ($952) and $5,781. Petitioner needed the respective amounts of $11,535, $11,078 and $13,853 to pay increased income tax in later years by reason of deducting depreciation under this accelerated method during the years in issue. One of petitioner's major financial threats is the continual hazard of possible large accidents causing loss of life, especially in view of its heavy equipment traveling on increasingly congested highways. Petitioner carried casualty insurance during the years in issue and prior thereto known as a retrospective policy, which means that petitioner must pay additional premiums if it has a bad loss ratio, but will receive a refund if it has a good loss ratio. Petitioner was concerned with respect to possible increased insurance premiums during these years under its retrospective policy. Petitioner was advised by letter dated May 3, 1971, from its agent, *267 Benson Insurance Agency, that an accident which occurred on March 9, 1971, involving petitioner and resulting in two deaths, a bodily 11 injury and considerable property damage could result in an increased retrospective premium of approximately $30,000 for the policy period November 27, 1969, to November 27, 1972. On November 12, 1971, petitioner paid $8,506 additional retrospective premium for the policy period ending November 27, 1972. By letter dated January 6, 1972, CNA Insurance Company, petitioner's casualty insurer, advised petitioner of a pending suit which could result in damages in the amount of $50,000 in excess of its bodily injury limits under its policy for the period ended November 27, 1972. Prior to and during the period from 1967 through 1969 petitioner needed to acquire additional property for its business use. Petitioner had occupied its office and warehouse building at 301 West Seymour Street in Muncie under lease from Central Indiana Warehouse Company for many years prior to 1967, as well as during the years 1967 through 1969. It had also owned and occupied another piece of property on West Powers Street, across South Liberty Street to the southwest, *268 from its principal office on West Seymour, for many years prior to 1967, which petitioner used for equipment repair, dispatching office and trailer parking. Prior to 1967 the Nelson family owned two conveniently adjacent properties which were suitable parcels for petitioner's expansion acquisition. One was immediately adjacent on the west of petitioner's leased main office, 12 which petitioner acquired in 1968 for $60,000. At its meeting on December 11, 1966, petitioner's board concluded that its purchase earlier that year of a parcel for additional parking space had not solved the problem and that additional land for this purpose was needed. At its meeting on January 22, 1968, the board again concluded that "The need for more space for parking trailers is becoming more acute" but that there had been "no success in finding available property for sale near the premises of the company." The remaining piece of Nelson property was across Liberty Street to the southwest immediately adjacent to petitioner's other property on West Powers Street. Throughout the years 1967 through 1969, petitioner needed and planned to purchase this property after the consideration of "more pressing *269 needs." Its owners quoted an asking price of $85,000 to James Adams, petitioner's general manager, in late 1968, which he reported to Evelyn Snyder, petitioner's president. Petitioner's board of directors continued to give consideration to the purchase of this or comparable trailer parking property at their meetings on January 22, 1968, and January 20, 1969, which was followed by a written offer at $80,000 by the Nelson family on March 29, 1971. After negotiations between the parties, petitioner purchased this property in August 1972 for $30,000. There were no other available adjacent properties for petitioner's expansion because of an established residential neighborhood in one direction and a railroad siding in another direction. 13 Petitioner desired to purchase its leased main office during the years in issue and was quoted a price of from $30,000 to $40,000 by Robert Duncan of the lessor company in late 1967, but was later advised that the property was not available for sale at that time. In 1971, Mrs. Snyder requested Mr. Adams to again contact the lessor to obtain a current price quotation for this property and he responded by letter dated March 31, 1971, in the amount *270 of $49,000, although he also stated that this was not an offer to sell. The minutes of petitioner's annual directors' meeting on January 19, 1970, stated, in part, as follows: The following matters were discussed at length, which are of vital interest to the welfare of our company in the coming year. 1.) The expiration on March 31, 1970, of the current three-year labor contract with Teamsters Local #135, with the possibility of a costly strike and the certainty of increased costs in wages and fringe benefits, resulting in greater expense to our company. 2.) The expiration on September 14, 1970, of the United Auto Workers contract, which if the auto industry should be shut down by a strike or lockout, would halt the major source of the revenue of Delaware Trucking Company for the duration of the work stoppage. 3.) Rates were discussed, and a sizeable increase will definitely be necessary in our local and P.S.C.I. machinery tariff, and also in our negotiations with the Western Electric Company, whose contract must be renewed for the coming two years. 14 4.) Miss Sisk recommended an amount of approximately $8500.00 to $9000.00 be earmarked and held in reserve for *271 the purpose of settling any justifiable refunds after auditing certain freight claims sent to us by Freight Traffic Service Company, Detroit, Michigan, auditing freight bills for a major customer of ours. 5.) Preparation for increase in charges by our cartage man in Detroit, Michigan, Mr. William Dooley, of Fourteenth Avenue Cartage Company, since he is also working under the Teamster National contract. 6.) Consideration of constructing a new office and warehouse facility in the event we would be notified of our present facility being for sale at the expiration of our lease. 7.) Increased maintenance cost during 1969, indicating need for purchase of some newer power equipment and trailers. There being so many unknown factors presenting themselves in 1970, the board found it impossible to forecast expenditures and need for credit financing at this time. Inflation, high interest rates, and excessive tax burdens continue to present a serious problem to the board with regard to making decisions about potential expansion, keeping in mind the grave importance of protecting the solvency and financial stability of our company. The minutes of petitioner's special directors' meeting *272 on April 19, 1970, stated, in part, as follows: Mr. Adams reported that the new National Teamster contract, as proposed by the Union and negotiated by T.E.I. indicates an increase in wages and benefits over the next thirty-nine months of about 38%. It has been brought to our attention that three lots adjoining our rental property at second and Mulberry streets are being offered for sale at a price of $5,000.00 15 under a receivership action. The board voted unanimously to purchase this land at this price, which will enhance the present value of the property due to its prior limited parking facilities. Mr. Howard Williams, our auditor, has advised us to invest in any real estate that can be used by the company for expansion, or for improvement of any real estate held by the corporation. Mr. Adams remarked that we shall be in need of additional warehouse space because of extensive construction by Indiana Bell Telephone Company, and therefore increased material for storage for Delaware Trucking Company. He is to check on the availability of storage space for rent in the event it is required. No loans or advances have been made by petitioner to its shareholders or officers. *273 During the taxable period there were no expenditures by petitioner for the personal benefit of its shareholders. The Last Will and Testament of Hortance L. Oliver provides, nter alia, as follows: ITEM THREE. All of the rest and residue of my estate, real, personal and mixed, of every kind and character, of which I may die seized or possessed or in which I may have any interest whatever and wheresoever the same may be situate, remaining after the provisions of Items One (1) and Two (2) of this will have been complied with in full, I give, devise and bequeath unto my trustees hereinafter named, to divide the same into two (2) equal shares and to own, hold, administer and dispose of each of said equal shares as trustees in trust, for the following uses and purposes and upon the following terms and conditions: 16 1 - To pay from one of said equal shares, in monthly installments, to my dear wife, Marguerite M. Oliver, during her lifetime, so much of the income and/or principal from or of said share as the trustees in their sole discretion may deem necessary or proper for her comfortable maintenance and support, but not to exceed Five Thousand Dollars ($5,000.00) per year *274 except as hereinafter provided, and after the death of my said wife, to pay to my daugher, Florence Oliver Sowers, during her lifetime, from said share, so much of the income and/or principal from or of said share as in the sole discretion of the trustees may be necessary and proper for her comfortable maintenance and support, but not to exceed Five Thousand Dollars ($5,000.00) per year except as hereinafter provided for.At the death of the survivor of my said wife and my said daughter, the trust shall terminate and the remaining principal and income of said share shall be paid and distributed, absolute and unconditionally, to my granddaughter, Evelyn Sowers. 2 - To pay the other said equal share, in monthly installments, to my daughter, Florence Oliver Sowers, during her lifetime, so much of the income and/or principal from or of said other equal share as the trustees in their sole discretion may deem necessary or proper for her comfortable maintenance and support, but not to exceed Five Thousand Dollars ($5,000.00) per year except as hereinafter provided, and upon the death of my said daughter, the trust shall terminate and the remaining principal and income shall be distributed *275 and paid over to my granddaughter, Evelyn Sowers, absolute and unconditionally. 3 - In the event my said granddaughter shall die prior to the termination of either of the trusts set forth in paragraphs one (1) and two (2) of this item of my will, the remaining principal and income of the respective trusts, upon termination, shall be transferred and paid over to the issue of my said granddaughter in equal parts per stirpes, or if my said granddaughter shall die prior to the termination of said trusts leaving no issue surviving, then upon the termination of the trusts, the then remaining principal and income shall be paid and distributed to the heirs at law of my granddaughter under the 17 laws of descent and distribution of the State of Indiana, to be determined as if my granddaughter had died at the termination of the respective trusts. 4 - The trustees, with the written consent of my granddaughter, shall have authority to distribute out of principal and income from the respective trusts for my wife and my daughter such amounts in addition to those provided for in paragraphs one (1) and two (2) of this item of my will as may be necessary to pay the expenses of extended illness, *276 hospitalization or other emergency conditions. * * * ITEM SIX. I hereby constitute and appoint Merchants Trust Company of Muncie, Indiana, its successors and assigns, and Herbert P. Harrington, as trustees and executors under this will, and hereby grant unto my said executors all of the powers and authority conferred upon my said trustees as may be necessary and proper for the settlement of my estate. If the said Herbert P. Harrington should die prior to my death or should for any reason refuse or be unable to serve as co-trustee and co-executor, then I hereby direct that a successor or the individual trustee and executor shall be appointed by the majority vote of the corporate trustee and the beneficiaries then entitled to receive the income from their respective trusts. Evelyn S. Snyder was successor Trustee under Item Six of the Last Will and Testament of Hortance L. Oliver prior to, and during, the years 1967 through 1969. As of December 31, 1967, December 31, 1968, and December 31, 1969, the fair market values of the following assets owned by petitioner were as follows: 18 1967
1968
1969 Dreyfus Fund
$16,763.18
$18,730.40
$16,504.54
Investors Stock Fund, Inc.
32,564.53
23,751.54
U.S. Bonds
44,100.00
44,100.00
44,100.00
Industrial Trust Co (Stock)
2,125.00
*277 Petitioner bought and held shares of Dreyfus Fund and Investors Stock Fund, Inc., mutual fund companies, during these years as a means of holding its liquid funds available for purchasing land and equipment in a form that would serve as a hedge against inflation. On June 3, 1971, pursuant to Section 534(b) of the Internal Revenue Code of 1954, the Commissioner of Internal Revenue advised petitioner by letter that he proposed the issuance of a statutory notice of deficiency for the taxable years 1967, 1968 and 1969 under section 531, relating to the tax on accumulated earnings. On July 20, 1971, pursuant to section 534(c), respondent received from the petitioner a timely statement submitted to establish that all or part of the earnings and profits for such taxable years were not permitted to accumulate beyond the reasonable needs of the business. In such statement the petitioner listed the following grounds: (1) To meet the needs of the taxpayer for working capital with which to conduct the normal operations of its business; (2) to provide funds necessary for the replacement of, and additions to, its fixed assets; 19 (3) to provide funds for additional *278 insurance premiums; (4) to provide funds for future income tax resulting from use of an accelerated depreciation method; (5) to provide funds to offset probable future loss on disposition of a subsidiary; and (6) to provide funds for the acquisition of a building for its principal office and place of business. On July 21, 1972, petitioner filed a motion with this Court for an order that the burden of proof was on the respondent with respect to the grounds set forth in such statement. On August 30, 1972, after hearing oral arguments on such motion, this Court issued an order that the burden of proof under section 534 was shifted to respondent with respect to grounds (1) and (2) but that the burden of proof with respect to grounds (3) through (6) remained with the petitioner. ULTIMATE FINDINGS 1. During each of the taxable years 1967, 1968 and 1969 the petitioner did not permit its earnings and profits to accumulate beyond the reasonable needs, including reasonably anticipated needs, of its business. Petitioner's undistributed earnings and profits, after taxes, for each of those years were retained for the reasonable needs of its business. 20 2. Under section *279 535(c) (1) the petitioner is entitled to an accumulated earnings credit for each of the taxable years 1967, 1968 and 1969 equal to its undistributed taxable income for each of those years. OPINION In almost every case arising under section 531, two major questions are subject to resolution by the Court. First, were the taxpayer's retained earnings held for the reasonable needs of its business? If so, under section 535 the taxpyaer is not liable for the section 531 tax. If not, was the taxpayer formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by thus permitting its earnings to be accumulated instead of being distributed? Both of these are questions of fact. See Golconda Mining Corp., 58 T.C. 139, 160 (1972), on appeal (C.A. 9), and other cases cited therein. The primary and central issue is the reasonable needs of the business. If available assets are required to meet such needs, the mere fact that some of those assets could be used for dividends without impairing current business operations is beside the point. Faber Cement Block Co., Inc., 50 T.C. 317, 327 (1968). And certain basic principles *280 have emerged with general application to this central issue. 21 (1) This Court is "reluctant to substitute our business judgment for that of petitioner's management unless the facts and circumstances of record and the presumptive correctness of respondent's determination impel us to do so." Golconda Mining Corp., supra at 161; Faber Cement Block Co., supra at 319; Bremerton Sun Publishing Co., 44 T.C. 566, 583 (1965); Breitfeller Sales, Inc., 28 T.C. 1164, 1168 (1957); Dielectric Materials Company, 57 T.C. 587 (1972). (2) In determining whether earnings were held for the reasonable needs of the business, "the critical factor is not the monetary size of the accumulated earnings and profits but the liquid position of the taxpayer and the relation of that position to current and anticipated needs." Faber Cement Block Co., supra at 329; Golconda Mining Corp., supra; Magic Mart, Inc., 51 T.C. 775, 791 (1969); The Montgomery Co., 54 T.C. 986 (1970); Dielectric Materials, supra. *281 (3) This Court will "keep the whole forest in mind, not individual trees." Magic Mart, Inc., supra at 792; Faber Cement Block Co., Inc., supra; Smoot Sand & Gravel Corp., v. Commissioner, 241 F.2d 197, 207 (C.A. 4, 1957); Dielectric Materials Co., supra.
(4) This Court will endeavor to make certain that its conclusion as to the business needs of a taxpayer is "attuned to the real world." Dielectric Materials Co., supra.22 Applying these general principles, the particular factual circumstances which caused this petitioner to retain its earnings during the taxable years and the extent of such retention compared to its available liquid funds must be examined to test the reasonableness of petitioner's accumulation under section 537. Each of the reasonable business needs alleged by the petitioner will be considered. Petitioner has conceded that the alleged "future loss on disposition of subsidiary" is not a reasonable business need in any amount. Respondent has conceded the reasonable business need alleged for acquisition of fixed assets in the amounts of $155,774.75, $86,669.72 and $110,471.57 for the *282 taxable years 1967, 1968 and 1969, respectively. Respondent has also conceded that working capital is a reasonable business need but disputes the amount claimed by petitioner in each year. Working capital. Petitioner's position is based upon the single operating cycle (or Bardahl ) working capital method, plus an increment of approximately 75 percent to cover anticipated increased labor and other expenses under inflationary pressure. The 75 percent factor was arrived at by computing the single cycle working capital amount for the year 1970 under the Bardahl formula and comparing such amount with the Bardahl amount for 1967, with the result that the Bardahl 1970 amount was approximately 75 percent greater than the 23 1967 Bardahl amount. Such 75 percent was then applied to the Bardahl amounts for each of the taxable years 1967, 1968 and 1969. Mrs. Evelyn Snyder, petitioner's president and chief executive, testified that increased labor rates under the Teamsters contract was a matter of grave concern. Petitioner's board of directors expressed the same concern. As a member of the trucking industry, petitioner's labor rates are fixed by contract with the Teamsters Union. *283 Since petitioner does not negotiate such contracts separately, it is bound by a master contract for its area as negotiated by a trade association. By far the largest portion of petitioner's labor expense is represented by amounts paid to its drivers under its Teamsters Union contract. Thus the impact of its rates under these contracts is of vital importance to petitioner. Throughout the taxable years in issue (except for the first three months of 1967), petitioner paid its wages under a Teamsters contract effective April 1, 1967, and ending March 31, 1970. The timing of these contracts meant that petitioner would be subject in early 1970 to a new three-year contract to be negotiated prior thereto, since the Teamsters Union works under three-year contracts. Consequently, throughout the taxable years 1967 through 1969 the petitioner was deeply concerned as to the increased wage rates that would be imposed under a new Teamsters contract, since its history of dealing with the Teamsters had been sharply increased wage rates over a period of many years. 24 Petitioner's other expenses were also increasing steadily under general national inflationary pressures as disclosed by *284 its financial statements. Based upon these factors, petitioner's management steered a prudent financial course between the necessitities of successfully operating the business and the inflationary pressures which by 1967 were obviously rampant. Especially did the spectre of the three-year Teamsters contracts concern Mrs. Snyder because of her many years of prior experience as a trucking company executive. It is clear that a business cannot safely assume that its working capital needs will remain approximately the same from year to year for at least two reasons: (1) possible future growth and (2) increased expenses. This petitioner was faced with future working capital needs involving both of these needs. It contends that it should not be restricted to a static position during the taxable years, i.e., a single cycle amount without any recognition of probable future increased needs. By its evidence herein the petitioner has corroborated the soundness of this position, namely, its 1970 single cycle amount is approximately 75 percent greater than its 1967 amount. Hence, we think the petitioner is entitled to look to the future as it decided how much earnings should be retained *285 for subsequent working capital needs. 25 It is axiomatic that no formula, or combination of formulae, can provide a fixed answer which will inform corporate management how great the retained earnings should be in order to cope with its working capital requirements. For example, we have frequently held that the accumulation of funds to meet operating expenses "for at least one year is reasonable." The J. L. Goodman Furniture Co., 11 T.C. 530, 535 (1948); F. E. Watkins Motor Company, Inc., 31 T.C. 288 (1958); and James M. Pierce Corporation, 38 T.C. 643 (1962). And as we said in Magic Mart, Inc., supra at 791: "Some corporations may be so entitled; other may not." Petitioner's operating expenses for the taxable years 1967, 1968 and 1969 were $428,115, $551,278 and $568,421, respectively. If petitioner has here contended that one year's operating expenses should be thus retained, much greater amounts would have resulted than the claimed working capital herein, including the 75 percent inflationary increment. As the section 531 case law has developed through the years, this Court and other courts have endeavored to apply *286 some reasonable method that will provide ample cushion for a corporation to live and grow economically by conserving its own funds for working capital, and other needful, corporate purposes. The "one year's operating expenses" method was early applied. Later the single operating cycle 26 (or Bardahl ) method has often been applied, but this Court has never held that this method has the force of law or should be automatically applied in every section 531 case. As so aptly pointed out in Dixie, Inc. v. Commissioner, 277 F.2d 526, 528 (C.A. 2, 1960), affirming 31 T.C. 415 (1958), certiorari denied 364 U.S. 827 (1960), relied upon and quoted with approval in Magic Mart, Inc., supra: The rule of thumb so stated may be one for administrative convenience but should rise to no higher level. The search must always be concerned with the needs of the particular business as they existed during the particular year. [citing cases] [Emphasis supplied.] Likewise here, the single cycle method, or any other, "should rise to no higher level" then "administrative convenience." Where a taxpayer introduces evidence showing that the *287 single cycle method produces amounts inadequate to cope with rising needs, it will not be rigidly applied. Petitioner has introduced substantial evidence in this record that its particular working capital needs were at least $90,486, $97,197 and $129,665 for the particular years at issue. Perhaps its needs were greater, but the petitioner is claiming only these amounts. And respondent, who has the burden of proof on this ground, has not introduced substantial evidence with respect thereto. Accordingly, we conclude that the petitioner was entitled to retain the claimed amounts for working capital purposes. 27 Additional retrospective casualty insurance premiums. Petitioner's alleged business need for additional casualty insurance premiums was $30,000 for each of the taxable years. We reject this as a reasonable business need. Insurance expenses is a part of the operating costs used to compute working capital under the formula approach. Consequently, we think that to allow additional insurance premiums as a separate reasonable business need would distort petitioner's total reasonable business needs by counting the insurance item twice. Future income taxes. Petitioner *288 also claims a need for additional funds to pay future income taxes because of the accelerated depreciation methods it used. Again, it is our view that taxes are part of the working capital formula and to allow them as a separate item would distort the petitioner's total business needs by including this item twice. Furthermore, accrued taxes are allowed as liabilities reducing net liquid assets. Acquisition of additional real estate. Prior to and during the taxable years petitioner needed to acquire additional property for its business use, especially for additional parking space for its trailers and for repair of its equipment. Petitioner had occupied its office and warehouse building at 301 West Seymour Street in Muncie under lease from Central Indiana Warehouse Company for many 28 years prior to 1967. It had also owned and occupied another piece of property on West Powers Street, across South Liberty Street to the southeast, from its principal office on West Seymour, for many years which was used for equipment repair, dispatching office and trailer parking. Before 1967 the Nelson family owned two conveniently adjacent properties which were suitable parcels for petitioner's *289 expansion acquisition. One was immediately adjacent on the west of petitioner's leased main office, which petitioner acquired in 1968 for $60,000. At its meeting on December 11, 1966, petitioner's board of directors concluded that its purchase earlier that year of a parcel for additional parking space had not solved the problem and that additional land for that purpose was needed. At its meeting on January 22, 1968, the board again concluded that "The need for more space for parking trailers is becoming more acute" but that there has been "no success in finding available property for sale near the premises of the company." The remaining piece of Nelson property was across Liberty Street to the southwest and immediately adjacent to petitioner's other property on West Powers Street. Throughout the taxable years the petitioner needed and planned to purchase this property after the consideration of "more pressing needs." Its owners quoted an 29 asking price of $85,000 to James Adams, petitioner's general manager, in late 1968, which he reported to Mrs. Evelyn Snyder, petitioner's president.
Petitioner's board of directors continued to give consideration to the purchase of this *290 or comparable trailer parking property at their meetings on January 22, 1968, and January 20, 1969, which was followed by a written offer at $80,000 by the Nelson family on March 29, 1971. After negotiations between the parties, petitioner purchased this property in August 1972 for $30,000. There were no other available adjacent properties for petitioner's expansion because of an established residential neighborhood in one direction and a railroad siding in another direction. Based upon this evidence, throughout the taxable years the petitioner reasonably anticipated the need for approximately $80,000 for the purchase of the so-called Nelson property. The fact that petitioner carreid out its purchase plans in 1972 constitutes corroborating evidence of its earlier intent. That petitioner was able to purchase this property for only $30,000 compared to the original asking price of $85,000, later reduced to $80,000, does not weaken petitioner's position that it reasonably anticipated the prospective $80,000 expenditure as of December 31, 1967, December 31, 1968, and December 31, 1969. 30 A prospective buyer, as petitioner, must set aside a sufficient amount to meet an asking *291 price, in order to make certain that is will be able to finance the purchase without borrowing, pursuant to its policy. The important facts are: (1) That petitioner did plan to buy additional real property as far back as December 11, 1966, when its board concluded that additional land was needed for parking space; (2) that it continued this resolve throughout the taxable years, as evidenced by its board minutes and Mrs. Snyder's testimony; (3) that it received a written offer at $80,000 from the Nelson family on March 29, 1971; and (4) that it finally bought this property in August 1972. Prior to and during the taxable years, petitioner also desired to purchase its leased main office and was quoted a price of from $30,000 to $40,000 by its lessor in late 1967, but was later advised that the property was not available for sale at that time because of a mortgage encumbrance. In 1971, Mrs. Snyder requested Mr. Adams to again contact Mr. Goddard of the lessor company to obtain a current price quotation and he responded by letter dated March 31, 1971, in the amount of $49,000, although he also stated that this was not an offer to sell. Although petitioner does not here contend that *292 it reasonably anticipated the purchase of its leased office property 31 during the taxable years 1967 through 1970 so that it needed to retain earnings for such purpose, the evidence nevertheless shows that petitioner was keenly interested in acquiring this property if it should be available and, therefore, some amount between $30,000 and $49,000 would be required for that purpose. In deciding how much earnings to retain during the taxable years, petitioner was also contemplating the eventual purchase of its leased office building, which constitutes a motivating reason for its $80,000 retention for the more pressing need to acquire the additional real property from the Nelson family. In short, petitioner's real estate acquisition retention needs must be considered in the light of its desired eventual acquisition of its leased office quarters. We therefore conclude that the facts of record support petitioner's ground for retention of earnings of at least $80,000 as of December 31, 1967, December 31, 1968, and December 31, 1969, for purchase of additional real estate for parking its trailers and other business needs. Having considered all of petitioner's alleged business *293 needs, we must determine whether its total business needs, including anticipated needs, exceeded its available liquid assets as of December 31, 1967, 1968 and 1969. The following table shows that petitioner's liquid assets for each of the taxable years were less than its reasonable business needs: 32 Reasonable Business Needs:
1967
1968
1969 Working capital
$90,486.00
$97,197.00
$129,665.00
Fixed assets
155,774.75
86,669.72
110,471.57
Casualty insurance
-0-
-0-
-0-
Future income taxes
-0-
-0-
-0-
Loss on subsidiary
-0-
-0-
-0-
Additional real estate
80,000.00
80,000.00
80,000.00
$326,260.75
$263,866.72
$320,136.57
Liquid assets
$239,546.93
$260,631.26
$301,944.03
Shortage
($86,713.82)
($3,235,46)
($18,192.54)
Accordingly, we hold that the petitioner's earnings and profits were not permitted to accumulate beyond its reasonable business needs during the taxable years 1967, 1968 and 1969. Such being the case, we have no need, in light of the credit provided for in section 535(c) (1), to consider whether the proscribed purpose of avoiding income tax may have existed. Magic Mart, Inc., supra at 799; *294 Dielectric Materials Co., supra at 600. Decision will be entered for the petitioner. Footnotes
1. All statutory references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩